UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| In re:    JAMES A. MONCURE,<br>Debtor | Case No.<br>14-31546-KLP |
| LYNN L. TAVENNER, TRUSTEE,<br>Plaintiff | Chapter<br>7<br>Adv. Proc No. |
| Quantico Business Center, LLC,<br>QBC Properties, LLC,<br>SHS Quantico, LLC,<br>Dynasty Investors, LLC,<br>Judson Honaker, Jr., a/k/a B. Judson Honaker,<br>Jr. and<br>Larry D. Silver,<br>Defendants | |

**COMPLAINT TO AVOID TRANSFERS, TO RECOVER PROPERTY,
FOR VIOLATION OF THE AUTOMATIC STAY, AND FOR RELATED RELIEF**

Lynn L. Tavenner, the Chapter 7 Trustee (the "Trustee") for the bankruptcy estate (the

"Estate") of James A. Moncure (the "Debtor"), by undersigned counsel, files this Complaint

pursuant to §§ 105(a), 362, 541, 542, 549, 550 of 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"),

and other applicable law, for turnover, accounting, violation of the automatic stay in connection

with certain actions of the Defendants, common law conspiracy, statutory conspiracy, avoidance

of unauthorized post-petition transfers, tortious interference with an existing contract and/or

business expectancy, tortious interference with a contract expectancy, prospective business

_____
Lynn L. Tavenner (VSB No. 30083)
Paula S. Beran (VSB No. 34679)
David N. Tabakin (VSB No. 82709)
Tavenner & Beran
20 North 8th Street
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopier: (804) 783-1078

*Counsel for Lynn Lewis Tavenner, Chapter 7 Trustee*      1

relationship and/or economic advantages, and aiding and abetting in various independent torts. The Trustee, for the benefit of the Estate, seeks an accounting of any and all distributions from the QCC (as hereafter defined) project, compensatory damages, punitive damages, fees, and costs for the willful and intentional violation of the automatic stay, actual damages including costs and attorneys' fees and punitive damages including but not limited to treble damages for conspiracy, the avoidance, recovery and preservation for the benefit of the Debtor's Estate the value of any post-petition transfer, actual damages as well as the imposition of a constructive trust on any and all proceeds gained as a result contracts/business expectancies/business relationships interfered with by the Defendants, and actual and punitive damages for the Defendants' aiding and abetting of independent torts:

## JURISDICTION

1.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2.      Venue lies properly in this Court pursuant to 28 U.S.C. § 1409.

3.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

## THE PARTIES

4.      The Plaintiff is Lynn L. Tavenner, the Chapter 7 Trustee (the "Trustee" or the "Plaintiff") of the Debtor's Estate who was appointed as trustee on March 28, 2014.

5.      Quantico Business Center, LLC (the "Original QBC") is a person as defined in § 101(41) of the Bankruptcy Code residing in and/or conducting business in the United States and, at all times material hereto, was a lender, investor, vendor, supplier, or otherwise maintained a business relationship with the Debtor. The Debtor and Defendant were engaged in the development

of the Quantico Corporate Center. The Defendant Original QBC is an insider of the Debtor as such term is defined in § 101(31) of the Bankruptcy Code.

6.      QBC Properties, LLC (the "Second QBC") is a person as defined in § 101(41) of the Bankruptcy Code residing in and/or conducting business in the United States. The Defendant Second QBC is an insider of the Debtor as such term is defined in § 101(31) of the Bankruptcy Code.

7.      SHS Quantico, LLC ("SHS") is a person as defined in  § 101(41) of the Bankruptcy Code residing in and/or conducting business in the United States and, at all times material hereto, was a lender, investor, vendor, supplier, or otherwise maintained a business relationship with the Debtor. The Debtor and Defendant SHS were engaged in the development of the Quantico Corporate Center (as hereafter defined). The Defendant SHS is an insider of the Debtor as such term is defined in § 101(31) of the Bankruptcy Code.

8.      Dynasty Investors, LLC ("Dynasty"), is a person as defined in § 101(41) of the Bankruptcy Code residing in and/or conducting business in the United States.

9.      Judson Honaker, Jr. a/k/a/ B. Judson Honaker, Jr.  ("Honaker") is a person as defined in § 101(41) of the Bankruptcy Code residing in and/or conducting business in the United States. The Debtor and Defendant Honaker were engaged in the development of the Quantico Corporate Center (as hereafter defined). The Defendant is an insider of the Debtor as such term is defined in § 101(31) of the Bankruptcy Code.

10.      Larry D. Silver ("Silver" and together with Original QBC, Second QBC, SHS, Dynasty, and Honaker, the "Defendants" and each a "Defendant") is a person as defined in § 101(41) of the Bankruptcy Code residing in and/or conducting business in the United States. The Debtor and Defendant Silver were engaged in the development of the Quantico Corporate Center

(as hereafter defined). The Defendant Silver is an insider of the Debtor as such term is defined in § 101(31) of the Bankruptcy Code.

## FACTUAL BACKGROUND

11.     During the years 2001 through 2005, the Debtor conceived the idea of a corporate technology park, procured certain land, and created the Quantico Corporate Center at Stafford ("QCC", also known as the "Quantico Corporate Center"). QCC is a business park located in Stafford County, Virginia, along Interstate 95 and US 1, adjacent to Marine Corps Base Quantico. QCC currently has a number of tenants, including major government contractors, a wide array of businesses, colleges, and others. Upon information and belief, to facilitate the creation of the technology park, certain property identified for the development of the QCC concept was placed in the name of Moncure Brothers, LLC ("MB"). The Debtor is one of three members of MB, and upon information and belief, served as the managing member through the Petition Date (as hereinafter defined). MB subsequently partnered with entities commonly referred to as the Silver Companies[1] to develop the QCC project. The Debtor, individually, acquired certain additional properties over the life of the project and subsequently added those properties to the QCC project. Until shortly before the Petition Date (as hereinafter defined), the Debtor served as a managing partner of the QCC project.

12.     Beginning prior to January 2010 and continuing through at least March 2014, the Debtor devised, intended to devise, and executed a scheme to defraud individuals and entities.

13.     Over a course of many years, the Debtor solicited investors to loan him money. Investors believed they were investing in the acquisition of land for, and development of, the QCC

---

[1] Entities owned, at least in part, by Carl D. Silver. Upon information and belief, Carl D. Silver is now deceased. Upon information and believe, Larry D. Silver is the son of Carl D. Silver.

project. The Debtor solicited investors, in part, by telling them he was acquiring land to complete the development of the QCC project. Upon information and belief, certain investors received promissory notes to document amounts loaned to the Debtor.

14.    For the period beginning in January 2010 up through April 2014, investigators with the Federal Bureau of Investigations ("FBI") traced more than $35 million of deposits into accounts held in the Debtor's name. A substantial portion of these funds appears to be from individuals or entities having, or believing to have, a financial interest or investment in the QCC project. Certain of these funds received were clearly used for purposes other than the development of the QCC project. For example, FBI investigators traced more than $16,000,000 as having been transferred into investment trading accounts from which the Debtor actively day-traded stocks and options. Analysis of the trade, deposit, and withdrawal records of these accounts reveal that the Debtor lost more than $14,000,000 over a four-year period through poor trade results and expenses associated with the trading accounts. The Debtor admitted the same in connection with the Plea Agreement and Statement of Facts entered into by and between the Debtor and the United States of America whereby the Debtor plead guilty to a count of Wire Fraud in violation of 18 U.S.C. § 1343 and Engaging in Unlawful Monetary Transactions in violation of 18 U.S.C. § 1957(a). *See* Plea Agreement, United States v. Moncure, Case No. 3:14-cr-00137 (E.D. Va. Feb. 6, 2015), ECF No. 26; Statement of Facts, United States v. Moncure, Case No. 3:14-cr-00137 (E.D. Va. Feb. 6, 2015), ECF No. 27.

15.    As part of the Debtor's scheme to defraud individuals and entities, the Debtor also routinely utilized "new" investor funds to pay returns or make repayments to other investors. Statement of Facts, United States v. Moncure, Case No. 3:14-cr-00137 (E.D. Va. Feb. 6, 2015), ECF No. 27.

16.     As part of the Debtor's scheme to defraud individuals and entities, the Debtor made repayments on certain of the investments. Statement of Facts, United States v. Moncure, Case No. 3:14-cr-00137 (E.D. Va. Feb. 6, 2015), ECF No. 27. The Debtor also paid individuals and entities for other goods and services he desired.

17.     Carl D. Silver, LLC, an entity related to the Defendants, wired $400,000.00 on September 4, 2013, to an account at Wells Fargo Bank, N.A., in the dominion and control of the Debtor.

18.     As part of the Debtor's scheme to defraud individuals and entities, the Debtor on September 5, 2013, issued check number 122 from an account under his dominion and control at Virginia Partners Bank to David Newman for $125,000.00. Upon information and belief, Mr. Newman is an employee and/or partial owner of one or more of the Silver Companies.

19.     As part of the Debtor's scheme to defraud individuals and entities, the Debtor thereafter on September 17, 2013, wired $400,000.00 to the account of Samer and Catherine Shalaby. On information and belief, Samer Shalaby is a member of SHS along with Larry D. Silver and Jed Honnaker. SHS and Moncure Brothers, LLC were at one time joint owners of Quantico Business Center, LLC, the entity that owned the land on which the QCC project was being developed.

20.     As part of the Debtor's scheme to defraud individuals and entities, the Debtor on September 18, 2013, issued check number 3052 from an account under his dominion and control at PNC Bank to David Newman for $6,355.00.

21.     As part of the Debtor's scheme to defraud individuals and entities, the Debtor on September 18, 2013, issued check number 3051 from an account under his dominion and control at PNC Bank to David Newman for $50,000.00.

22.     Beginning sometime in 2013, the Debtor began to default on loan repayments to his investors while continuing to accept new investment money as part of the Debtor's scheme to defraud individuals and entities.

23.     During the fall of 2013 and the beginning of 2014, the Debtor continued his scheme to defraud individuals and entities.

24.     As part of the Debtor's scheme to defraud individuals and entities, the Debtor on February 3, 2014, issued check number 3130 from an account under his dominion and control at Virginia Partners Bank to Samer Shalaby for $100,000.00.

25.     As part of the Debtor's scheme to defraud individuals and entities, the Debtor on February 5, 2014, issued check number 3096 from an account under his dominion and control at PNC Bank to David Newman for $10,000.00.

26.     As part of the Debtor's scheme to defraud individuals and entities, the Debtor on February 10, 2014, issued check number 3137 from an account under his dominion and control at Virginia Partners Bank to David Newman for $130,000.00.

27.     With the Debtor's scheme coming unraveled, on March 4, 2014, he sent a lengthy email to his investors and business partners apologizing for certain of his indiscretions. Thereafter, at least one of the Defendants met with the Debtor.

28.     On March 24, 2014 (the "Petition Date"), N. Brent Higginbotham, Doris G. Higginbotham, Katherine Higginbotham Brown, Forrest S. Higginbotham, and Thomas Higginbotham, by certifying under penalty of perjury that each held claims against the Debtor, instituted an involuntary bankruptcy petition in this Court against the Debtor under Chapter 7 of the Bankruptcy Code in this Court. Thereafter, on March 27, 2014, the Debtor filed the Debtor's

Consent to Entry of Order for Relief. Subsequently, this Court entered an Order for Relief on March 27, 2014.

29.    On March 28, 2014, this Court appointed Lynn L. Tavenner as trustee of the Debtor's Estate, and she continues to serve as Trustee.

30.    On August 24, 2014, the Debtor was formally charged by the United States of America and an arrest warrant issued.

31.    On October 7, 2014, the Debtor was officially indicted on seven counts, including mail fraud, wire fraud, and engaging in unlawful monetary transactions.

32.    The Debtor acknowledged his guilt, admitted to the fraudulent scheme, and was sentenced to a term of not less than five years in a federal penitentiary.

33.    As referenced above, the Debtor, through his interest in MB and other entities, partnered with various Silver Companies and/or one or more of the Defendants over the years to develop, market, and ultimately sell buildings at QCC. *See* Exhibit A. Quantico Business Center, LLC Operating Agreement. On information and belief at all times relevant hereto, the Debtor (through MB and/or other entities) and SHS (and/or related entities) were joint owners of certain entities that owned property at the QCC. *See Id.* The primary vehicle for the ownership structure was the Original QBC.

34.    After the Petition Date, the Trustee and her counsel corresponded and communicated with MB's counsel. In connection with these discussions, the Trustee requested (a) that any and all distributions from MB on behalf of the Debtor be sent to her, (b) an accounting of any and all sales, past and future, of any and all property at the QCC project, and (c) other information about MB.

8

35.    Upon information and belief, in response to the Trustee's request, MB and/or its counsel requested from one or more of the Defendants an accounting of all distributions from the QCC project for the preceding years.

36.    One or more of the Defendants provided MB an accounting of one of the sale transactions at the QCC project. MB's counsel forwarded this information to the Trustee. Thereafter, counsel for one or more of the Defendants (and/or a related or affiliated entity) provided to MB's counsel a different accounting for the same transaction, and MB's counsel forwarded this accounting to the Trustee.

37.    MB's counsel again requested from one or more of the Defendants a complete accounting of all distributions from the QCC project. MB's counsel also informed counsel for one or more of the Defendants that MB was cooperating with the Trustee. The Defendants knew that MB was cooperating with the Trustee.

38.    The Defendants had actual knowledge of the Debtor's bankruptcy case on or before May 7, 2015.

39.    On information and belief, in response to learning that MB was cooperating with the Trustee, on or about May 7, 2015, the Defendants willfully and maliciously conspired to and acted to dilute the membership interest of MB in the QCC project with the specific intent to devalue the Debtor's in the QCC project.

40.    On information and belief, certain members of the Silver Companies formed Dynasty.

41.    On information and belief, at the suggestion and/or insistence of one or more of the Defendants, MB and the Defendants entered into an operating agreement (the "Second QBC Operating Agreement") to form the Second QBC, merging the Original QBC with the Second

9

QBC. *See* Exhibit B. Notwithstanding that the Defendants knew that MB had retained counsel (counsel that all knew was cooperating with the Trustee), MB's counsel was not involved in drafting, negotiating and/or the execution of the Second QBC Operating Agreement. Notwithstanding that the Defendants knew that MB had retained counsel (counsel that all knew was cooperating with the Trustee), MB's counsel was not alerted of the fact that MB's interest in the QCC project and the Original QBC was being diluted with the merger of the Original QBC into the Second QBC until after the execution of the Second QBC Operating Agreement.

42.     On information and belief, Dynasty received a 0.01 percent ownership interest in the Second QBC, MB received a 49.995 percent ownership interest in the Second QBC, and SHS received an ownership interest of 49.995 percent in the Second QBC.

43.     On information and belief, as a result of the Second QBC Operating Agreement and creation of the Second QBC, the individuals behind SHS and Dynasty, thereafter, control a majority interest in the QCC project to the detriment of MB and the Debtor's interest in the QCC project.

44.     On information and belief, the Defendants willfully and maliciously took these actions with the specific intent to dilute the Debtor's ownership interest in the QCC project.

45.     On information and belief, one or more of the Defendants, and/or authorized agents of one or more of the Defendants, told the other members of MB that, by entering into the Second QBC Operating Agreement, the other members of MB would be protecting themselves and their interest in the QCC project from the Debtor's bankruptcy case and the Trustee.

46.     On information and belief, the Defendants' actions were willful, with the full knowledge of the Debtor's bankruptcy case.

47. To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

48. The Trustee's investigation is on-going and the Trustee reserves the right to supplement the information on the actions of the Defendants.

## <u>COUNT ONE</u>
**Turnover and Accounting – 11 U.S.C. § 542**

49. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

50. The Debtor's interest in the QCC project constitutes property of the Estate to be administered by the Trustee pursuant to § 541 of the Bankruptcy Code.

51. As a result of the foregoing, pursuant to § 542 of the Bankruptcy Code, the Trustee is entitled to an accounting of all distributions from the QCC project.

## COUNT TWO
### Willful Violation of the Automatic Stay

52.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

53.    The Debtor's ownership interests in the QCC project are assets of the Estate.

54.    The Defendants are (and were at all relevant times) certainly aware of the Debtor's bankruptcy case.

55.    The Defendants have willfully exercised control over property of the Debtor's Estate.

56.    Despite their awareness of the existence of the Debtor's pending bankruptcy case, the Defendants intentionally diluted the Debtor's ownership interest in the QCC project in willful violation of the automatic stay of § 362(a) of the Bankruptcy Code.

57.    The Debtor (and his Estate) has been damaged by the Defendants' control over property of the Estate.

58.    As a result of the foregoing, (a) the Trustee, on behalf of the Estate, is entitled to recover from the Defendants actual damages, including costs and attorneys' fees, and punitive damages, and (b) the actions taken in violation of the automatic stay should be voided.

## COUNT THREE
### Common Law Conspiracy

59.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

60.    The Debtor's interest in the Original QBC and in the QCC project constitute property of the Estate.

61.    Defendants combined to accomplish, by concerted actions, the unlawful purpose or some lawful purpose by unlawful means of (a) violating the automatic stay of the Bankruptcy Code and/or (b) diluting the Debtor's ownership interest in the Original QBC and/or QCC project.

62.    The Debtor (and his Estate) was damaged as a result of the Defendants' conspiracy to (a) violate the automatic stay of the Bankruptcy Code and/or (b) dilute the Debtor's ownership interest in the Original QBC and/or the QCC project.

63.    As a result of the foregoing, the Trustee, on behalf of the Estate, is entitled to recover actual damages including costs and attorneys' fees and punitive damages including but not limited to treble damages.

## COUNT FOUR
### Statutory Conspiracy Va. Code Ann. §§ 18.2-499, 500

64.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

65.    Two or more of the Defendants combined, agreed, and/or mutually undertook to willfully and maliciously injure the Debtor and/or the Debtor's interest in the QCC project.

66.    Defendants violated Virginia Code sections 18.2-499 and 18.2-500 and are liable, therefore, as Defendants combined, associated, agreed, mutually undertook, and/or in concert together to willfully and maliciously injure MB and the Debtor in the trade, business, and profession of the two persons without lawful justification.

67.    Defendants acted intentionally, purposefully, and without lawful justification by intentionally and purposefully conspiring to (a) violate the automatic stay of the Bankruptcy Code and/or (b) to dilute the Debtor and MB's interests in the Original QBC and/or in the QCC project.

68.     The Debtor and/or his Estate have been damages by the Defendants' actions.

69.     As a result of the foregoing, the Trustee, on behalf of the Estate, is entitled to recover actual damages including costs and attorneys' fees and punitive damages including but not limited to treble damages.

## <u>COUNT FIVE</u>
## POST-PETITION TRANSFER 11 U.S.C. §§ 549, 550, AND 551

70.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

71.     The Debtor's interest in the Original QBC and/or the QCC project constituted property of the Estate.

72.     The Defendants conspired to directly, absolutely, and voluntarily dispose of property or an interest in property of the Debtor by diluting and transferring the Debtor's and MB's interest in the Original QBC and/or the QCC project.

73.     The actions by which the Defendants accomplished the transfer of property of the Estate occurred after the Petition Date.

74.     The actions by which the Defendants accomplished transfers (as defined in § 101(54) of the Bankruptcy Code) of property of the Estate after the Petition Date by the Defendants were not authorized under § 303(f) or 542(c) of the Bankruptcy Code or by this Court.

75.     Any transfers (as defined in § 101(54) of the Bankruptcy Code) of property of the Estate after the Petition Date by the Defendants was not authorized under the Bankruptcy Code or by this Court.

76.    The transfer of the Debtor's ownership interest constitute a post-petition transfer avoidable by the Trustee pursuant to § 549 of the Bankruptcy Code and recoverable from the Defendants pursuant to § 550(a) of the Bankruptcy Code.

77.    The diversion of any moneys or other consideration due the Debtor as a result of the transfers of the Debtor's ownership interest constitute post-petition transfers avoidable by the Trustee pursuant to § 549 of the Bankruptcy Code and recoverable from the Defendants pursuant to § 550(a) of the Bankruptcy Code.

78.    Wherefore, the Trustee is entitled to judgment pursuant to §§ 549, 550(a), and 551 of the Bankruptcy Code (a) avoiding, recovering, and preserving for the benefit of the Debtor's Estate the value of the improper transfer of the Debtor's interest in the QCC project, (b) avoiding, recovering, and preserving for the benefit of the Debtor's Estate the value of the diversion and/or payment of any moneys or other consideration due the Debtor as a result of the improper transfer of the Debtor's interest in the QCC project, and (c) directing that the post-petition transfer be set aside.

## COUNT SIX
### Tortious Interference with an Existing Contract

79.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

80.    The Debtor had a valid business expectancy in the QCC project given his interest in MB, MB's operating agreement, and/or MB's interest in the Original QBC and/or the QCC project.

81.    The Defendants knew of the Debtor's contractual relationship and/or expectancy.

82.     The Defendants acted intentionally to interfere with (i) the contractual and/or business relationship between the Debtor and MB (and its members) and (ii) the contractual relationship among the Debtor, MB, and the Original QBC by inducing and causing a breach or termination of the Original QBC, thus diluting the interest of the Debtor and MB in the QCC project.

83.     As a result of the Defendants' intentional actions, the Debtor's ownership interest in the QCC project was diminished and damaged.

84.     As a result of the foregoing, the Trustee, on behalf of the Estate, is entitled to actual damages as well as the imposition of a constructive trust on any and all proceeds gained from Defendants as a result of the contracts interfered with by the Defendants.

## COUNT SEVEN
### Tortious Interference with a Contract Expectancy, Prospective Business Relationship, or Economic Advantage

85.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

86.     The Debtor, through MB and MB's ownership interest in the Original QBC and/or the QCC project, had a direct contract expectancy, prospective business relationship and/or economic advantage given the percentage ownership interest in the QCC project.

87.     The Defendants had actual knowledge of said contract expectancy, prospective business relationship, and/or economic advantage.

88.     Absent the Defendants' intentional misconduct there existed a reasonable certainty that the Debtor (or his Estate) would have continued in the relationship and realized the expectancy of the value of the QCC project.

89.     The Defendants used improper means or methods to intentionally interfere with the contract expectancy, prospective business relationship, and economic advantage when they conspired to willfully and maliciously (a) violate the automatic stay of the Bankruptcy Code and/or (b) dilute the Debtor's interest in the QCC project.

90.     As a result of the Defendants' intentional actions, the Debtor's ownership interest in the QCC project was diminished and damaged.

91.     As a result of the foregoing, the Trustee, on behalf of the Estate, is entitled to actual damages as well as the imposition of a constructive trust on any and all proceeds gained from Defendants as a result of the contracts interfered with by the Defendants.

## COUNT EIGHT
### Aiding and Abetting

92.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

93.     The manager(s) and/or members of MB possessed a fiduciary duty to the Debtor.

94.     The Defendants conspired to and did aid and abet the manager(s) and/or members of MB to breach their duty to the Debtor.

95.     The Defendants had actual knowledge of the fact that they were each aiding and abetting in the breach of the aforementioned fiduciary duty to the Debtor.

96.     The Defendants conspired to and did aid and abet each other in tortuously interfering with the Debtor's ownership interest in the Original QBC and/or the QCC project.

97.     The Defendants had actual knowledge of the fact that they conspired to and did aid and abet each other in tortuously interfering with the Debtor's ownership interest in the Original QBC and/or the QCC project.

98.    The Defendants conspired to and did aid and abet each other in statutory and common law conspiracy.

99.    The Defendants had actual knowledge of the fact they conspired to and did aid and abet each other in statutory and common law conspiracy.

100.    The Defendants individually provided substantial assistance and encouragement of their actions.

101.    As a result of the foregoing, the Trustee is entitled to actual and punitive damages.

WHEREFORE, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants:

a.    On the First Claim for Relief, pursuant to §§ 542, 542, 550(a), and 551 of the Bankruptcy Code for an accounting by the Defendants of all distributions from the QCC project;

b.    On the Second Claim for Relief, pursuant to § 362(k) of the Bankruptcy Code: (a) awarding any and all actual damages including but not limited to the value of the dilution of the Debtor's interest in the QCC project, (b) awarding punitive damages for the Defendants' willful and intentional actions, and (c) awarding the Trustee the costs and attorneys fees of this action;

c.    On the Third Claim for Relief, pursuant to the common law of conspiracy, the Trustee, on behalf of the Estate, is entitled to recover actual damages including costs and attorneys' fees and punitive damages including but not limited to treble damages;

d.    On the Fourth Claim for Relief, pursuant to Virginia Code sections 18.2-499 and 18.2-500, the Trustee, on behalf of the Estate, is entitled to recover actual damages including costs and attorneys' fees and punitive damages including but not limited to treble damages;

e.    On the Fifth Claim for Relief, pursuant to § 549, 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to (a) avoiding, recovering, and preserving for the benefit of the

Debtor's Estate the value of the improper transfer of the Debtor's interest in the QCC project, (b) avoiding, recovering, and preserving for the benefit of the Debtor's Estate the value of the diversion and/or payment of any moneys or other consideration due the Debtor as a result of the improper transfer of the Debtor's interest in the QCC project, and (c) directing that the post-petition transfer be set aside;

f.    On the Sixth Claim for Relief, pursuant to the common law of tortious interference with an existing contract, the Trustee, on behalf of the Estate, is entitled to actual damages as well as the imposition of a constructive trust on any and all proceeds gained from Defendants as a result of the contracts interfered with by the Defendants;

g.    On the Seventh Claim for Relief, pursuant to the common law of tortious interference with a contract expectancy, prospective business relationship, or economic advantage, the Trustee, on behalf of the Estate, is entitled to actual damages as well as the imposition of a constructive trust on any and all proceeds gained from Defendants as a result of the contracts interfered with by the Defendants;

h.    On the Eighth Claim for Relief, pursuant to the common law of aiding and abetting, the Trustee, on behalf of the Estate, is entitled to actual and punitive damages;

i.    On all Claims for Relief, pursuant to federal common law and Va. Code Ann. § 8.01-382 awarding the Trustee prejudgment interest from the date of any transfer referenced herein; and

j.    Granting such other and further relief as is just and proper.

Dated: March 25, 2016          Respectfully submitted,
        Richmond, Virginia

                               By: /s/ Paula S. Beran
                               Lynn L. Tavenner, Esquire (VSB No. 30083)

Paula S. Beran, Esquire (VSB No. 34679)
David N. Tabakin, Esquire (VSB No. 82709)
Tavenner & Beran
20 North 8th Street
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopier: (804) 783-0178

*Counsel for Lynn Lewis Tavenner,*
*Trustee*

Exhibit A

## FIRST AMENDED AND RESTATED
## OPERATING AGREEMENT

## QUANTICO BUSINESS CENTER, LLC

In consideration of the mutual promises of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned, Moncure Brothers, LLC, a Virginia limited liability company, and SHS Quantico, LLC, a Virginia limited liability company hereby enter into this First Amended and Restated Operating Agreement, effective as of this 11th day of September, 2005, for the governance of **QUANTICO BUSINESS CENTER, LLC**, a Virginia limited liability company, on the terms and conditions hereof. This First Amended and Restated Operating Agreement hereby supercedes and replaces, in its entirety, any prior operating agreement of the Company.

## ARTICLE I
## DEFINED TERMS

The capitalized terms used in this Operating Agreement shall, unless the context otherwise requires, have the meanings specified in this Article I.

**Act.** The Virginia Limited Liability Company Act §§13.1-1000 et seq. of the Code of Virginia, 1950, as amended, and any successor to such Act.

**Additional Land.** Any parcel of real property located within 3,000 feet of (a) the Land, or (b) any other real property purchased or obtained by the Company at any time. Additional Land shall not include any land that is intended to be developed for residential purposes.

**Affiliate(s).** As applied to a Person, any other Person directly or indirectly controlling, controlled by, or under common control with that Person. Controlling, controlled by or under common control means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through ownership of voting securities or otherwise.

**Articles of Organization.** The Articles of Organization of the Company described in Article II of this Operating Agreement.

**Bankruptcy; Bankrupt.** Bankruptcy under the Federal Bankruptcy Code, an assignment for the benefit of creditors and/or an adjudication of insolvency under any state insolvency act or procedure or the occurrence of any other event of bankruptcy under the Act.

**Business Day.** Any day other than a Saturday, Sunday and those legal public holidays specified in 5 U.S.C. § 6103(a), as amended from time to time.

**Capital Account.** The Capital Account established and maintained for each Member pursuant to Section 6.5 of this Operating Agreement.

**Capital Contributions.** The total amount of cash and/or the agreed fair market value of property actually contributed by a Member to the capital of the Company less the amount of indebtedness, if any, of such Member which is assumed by the Company and/or the amount of indebtedness, if any, to which such property is subject, as of the date of contribution (without regard to the provisions of I.R.C. Section 7701(g)), as well as any additional contributions actually made pursuant to this Operating Agreement, including, but not limited to, any amounts paid by a Member (except to the extent indemnification is made by another Member) in respect of any claims against, or liabilities or obligations of, the Company and/or pursuant to any guaranty of Company indebtedness (subject, however, to the provisions of Section 6.4) or otherwise by such Member.

**Code.** The Internal Revenue Code of 1986, as it has been and may be amended, or any similar Federal internal revenue law enacted in substitution of the Internal Revenue Code of 1986, and the corresponding revenue law (and sections thereof) of any state or jurisdiction.

**Company.** QUANTICO BUSINESS CENTER, LLC, as such limited liability company may from time to time be constituted.

**Company Property or Properties.** All interests, properties and rights of any type owned by the Company, whether owned by the Company at the date of its formation or thereafter acquired.

**County.** Stafford County, Virginia.

**Developer.** The development company engaged by the Company to perform certain development services in exchange for certain fees.

**Development.** Development has begun with respect to the Land once initial infrastructure improvements on the Land have commenced.

**Effective Date.** September 11, 2005.

**Interest.** All rights and interests of a Member under this Operating Agreement and the Act at any particular time, including, without limitation, (i) the right of a Member, expressed as a percentage on Schedule A, to receive distributions of revenues, allocations of income, loss and other tax incidents and distributions of liquidation proceeds and/or other sums under this Operating Agreement, (ii) all management rights, voting rights or rights to consent, and (iii) any and all other benefits to which a Member may be entitled as provided in this Operating Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of this Operating Agreement and the Act.

**Land.** Those certain parcels of land located in Stafford County, Virginia, as such parcels are more fully described on Schedule B hereto, to be contributed to the Company as provided in Section 6.1, which shall be contributed to the Company by Moncure or its applicable Affiliate.

**Manager.** Manager is defined in Section 10.1.

2

**Member(s).**  At any time, the Person(s) who then own Interests in the Company.  The Members are listed on <u>Schedule A</u>.

**Moncure.**  Moncure Brothers, LLC, a Virginia limited liability company.

**Net Cash Flow.**  The total cash receipts of the Company (including, without limitation, loan proceeds, refinancing proceeds, gross sales proceeds and the cash Capital Contributions of the Members), *plus* any other funds (including amounts previously set aside as reserves by the Manager, where and to the extent the Manager no longer regards such reserves as reasonably necessary in the efficient conduct of the Company business) deemed available for distribution and designated as Net Cash Flow by the Manager, in its reasonable discretion, *less* the total cash disbursements of the Company such as, but not limited to, operating expenses of the Company, payments of principal and interest on any loans made to the Company by any Person whatsoever (including Members), and payments due under the VCV Purchase Agreement, and *less* such reserves or other uses of cash as the Manager, in its reasonable discretion, shall deem to be necessary for the efficient conduct of the Company business.

**Notification.**  A writing containing any information required by this Operating Agreement to be communicated to any Person, which may be personally delivered, sent by Federal Express, DHL, or other reputable overnight delivery service, or sent by facsimile transmission (with a copy of such transmission sent on the same day by Federal Express, DHL, or other reputable overnight delivery service marked for next Business Day delivery) to such Person, at the last known address of such Person on the Company records.  Any such Notification shall be deemed to be given (i) when delivered (or when delivery is refused), in the case of personal delivery, (ii) the next Business Day after the date on which it is properly deposited, marked for next Business Day delivery, with Federal Express, DHL, or other reputable overnight delivery service, in the case of overnight delivery, and (iii) when transmitted properly (being 9:00 a.m. to 5:00 p.m., local time for the recipient, on any Business Day) with confirmation of such transmission, in the case of facsimile transmission.  Any communication containing information sent to any Person other than as required by the foregoing sentences, but which is actually received by such Person, shall constitute Notification as of the date of such receipt for all purposes of this Operating Agreement.

**Operating Agreement.**  This First Amended and Restated Operating Agreement, including all exhibits and schedules attached hereto, as originally executed and as subsequently amended from time to time.

**Percentage Interest.**  With respect to each Member, the percentage participation in the Company of such Member as set forth opposite the name of such Member under the column "Percentage Interest" in <u>Schedule A</u> attached hereto, as such percentage may be adjusted from time to time pursuant to the terms hereof.

**Person.**  Any natural person, limited liability company, general partnership, limited partnership, corporation, joint venture, trust, business trust, cooperative or association.

Exhibit A

**Prime Rate.** The "Prime Lending Rate" published and announced from time to time in the "Money Rates" section of the Wall Street Journal (or, if more than one rate is so published, the highest prime lending rate so published).

**Project.** The Land, together with all improvements thereon (including the anticipated business center to be developed and constructed on the Land and to be known as Quantico Corporate Center at Stafford, Virginia) and appurtenances thereto at any time existing during the term hereof.

**Property.** All real and personal property (including both tangible and intangible property) acquired by the Company, together with any improvements thereto.

**SHS.** SHS Quantico, LLC, a Virginia limited liability company.

**Transfer.** Any change occurring in the legal or beneficial ownership of an Interest, whether made voluntarily or involuntarily by operation of law, including, but not limited to, the following:

1.      except as expressly set forth below, a sale, assignment, pledge or gift to any Person, including specifically the transfer, in one or more related transactions, of a controlling ownership interest in a Member, including, without limitation, any such transfer that shall occur as a result of or in connection with a recapitalization, reorganization, merger, acquisition, takeover, or similar transaction;

2.      a general assignment for the benefit of creditors, or any assignment to a creditor resulting from the creditor's foreclosure upon or execution against such Interest (or any part thereof);

3.      the filing by the transferor Member of a voluntary Bankruptcy petition;

4.      the adjudication of a Member as Bankrupt or insolvent;

5.      the filing of a petition or answer by a Member seeking for such Member dissolution, winding up, reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or rule;

6.      the filing of an answer or other pleading by a Member admitting or failing to contest the material allegations of a petition filed against such Member in a Bankruptcy, insolvency, reorganization or similar proceeding;

7.      the seeking, consenting to or acquiescing in the appointment of a trustee, receiver or liquidator of the Member or of all or any substantial part of its property and/or all or any part of such Member's Interest;

8.      if a Member is a general or limited partnership, the dissolution and commencement of winding up of the partnership;

4

9.      if a Member is a corporation, the filing of a certificate of dissolution or its equivalent for the corporation or revocation of its charter; or

10.      if a Member is another limited liability company, the filing of articles of dissolution or termination or their equivalent for the limited liability company.

Notwithstanding the provisions of subparagraph 1 above to the contrary, the parties agree that (i) any merger by any party with an Affiliate of such party; (ii) any transfer, sale or assignment of a party's ownership interest in a Member to an Affiliate of such party; or (iii) any sale or assignment of an Interest by such party to an Affiliate of such party shall not be deemed a Transfer hereunder; provided, however, that, solely for purposes of defining a permitted Transfer hereunder, in addition to the transferee Affiliate being an Affiliate of such party, either (i) more than thirty percent (30%) of all economic rights, benefits and interests of such transferee Affiliate must be legally and beneficially owned (directly or indirectly) by such party; or (ii) more than thirty percent (30%) of all economic rights, benefits and interests of the party must be legally and beneficially owned (directly or indirectly) by such transferee Affiliate; and provided, further, that, no such permitted Transfer shall release such party from any of its obligations and responsibilities under this Operating Agreement.

**VCV Purchase Agreement.** VCV Purchase Agreement is defined in Section 4.3.

## ARTICLE II
## ORGANIZATION

Articles of Organization. Articles of Organization for the Company were filed with the Virginia State Corporation Commission on April 29, 2005, pursuant to the Act. This Operating Agreement is subject to, and governed by, the Act and the Articles of Organization. The existence of the Company began upon the effective date of filing of the Articles of Organization. The Company shall exist in accordance with the duration specified in the Articles of Organization.

## ARTICLE III
## NAME; PLACE OF BUSINESS; REGISTERED OFFICE AND AGENT

3.1    Name. The name of the Company is "QUANTICO BUSINESS CENTER, LLC".

3.2    Registered Agent; Registered Office; Principal Office in the United States. The registered agent of the Company is H. Glenn Goodpasture, who is a resident of the Commonwealth of Virginia and a member of the Virginia State Bar. The address of the registered office of the Company is in the City of Fredericksburg at 1602 William Street, Fredericksburg, VA 22401. The principal office of the Company in the United States is 1602 William Street, Fredericksburg, VA 22401.

### ARTICLE IV
### PURPOSE; ADDITIONAL LAND; VCV PURCHASE AGREEMENT

4.1    <u>Purpose</u>. The purpose of the Company shall be to acquire and hold the Land for investment purposes and, if and when necessary or appropriate, to sell or otherwise dispose of the Land for the production of profit, and further to engage in any and all other activities that may be incidental, proper, advisable or convenient to accomplish the foregoing, as determined by the Manager (including, without limitation, obtaining financing and refinancing therefor), and that is not prohibited by the laws of the jurisdiction in which the Company engages in such investment.

4.2    <u>Additional Land</u>. Additional Land is defined in Article I hereof and shall not be confused with the portions of the Land. In the event that Additional Land becomes available to the Company or to any party (or its Affiliate) to this Operating Agreement, such party (or Affiliate) shall endeavor to allow the Company the opportunity to purchase such Additional Land. Upon the acquisition of such Additional Land, it shall become part of the Land governed by this Agreement.    Once the Project is substantially completed (based on the initial development plans), this Section 4.2 shall terminate and such restrictions shall no longer be applicable to any party.

4.3    <u>Purchase Agreement</u>.    Each of the Members hereby ratifies, confirms and approves the Purchase Agreement between the Company and Virginia Center Ventures, a copy of which is attached hereto as Exhibit D ("VCV Purchase Agreement") and authorizes the Company to enter into and perform its obligations under the VCV Purchase Agreement.

### ARTICLE V
### MEMBERS

5.1    <u>Members</u>. The names and addresses of the Members of the Company are as set forth on <u>Schedule A</u> of this Operating Agreement.

5.2    <u>Admission of Additional Members</u>. Additional Members of the Company may be admitted as follows:

(a)    If the proposed additional Member desires to purchase an Interest from the Company, such purchase may be made and the admission of the additional Member shall become effective only if the identity of the proposed additional Member and the amount of the Capital Contribution to be made by such proposed additional Member in exchange for such proposed additional Member's Interest is first unanimously approved in writing by the existing Members, in their sole and absolute discretion.

(b)    If the proposed additional Member desires to acquire an Interest in a Transfer from an existing Member, such Transfer may be made and the admission of the additional Member shall become effective only in accordance with Article XI hereof.

(c)    All other attempted Transfers of any Interest or right, or any part thereof (legally or beneficially), in or in respect of the Company shall be null and void.

5.3    <u>Approval of Moncure</u>. The written approval of Moncure shall be required for any transfer or sale of Land which occurs prior to the construction of buildings upon such Land. If the Manager in its reasonable discretion, after consultation with Moncure, determines that a sale is necessary to prevent a default under any financing securing the Land, the Manager shall be entitled to approve such sale, provided that only that portion of the Land necessary to cure such default shall be sold. All other sales of any portion of the Land with building improvements may be approved by the Manager in its sole discretion.

## ARTICLE VI
## CAPITAL CONTRIBUTIONS AND INTERESTS

6.1    <u>Capital Contributions</u>. Each Member has contributed as the Member's Capital Contribution, the cash and/or other property set forth on <u>Schedule A</u> attached hereto, which the Members agree has a fair market value as set forth on <u>Schedule A</u>. In consideration for Developer's commitment to develop and construct office buildings on the Land, Moncure contributed the Land to the Company. No Member shall be obligated to make any additional Capital Contributions to the Company without the unanimous written consent of all Members.

6.2    <u>Interests</u>. Each Member owns the Percentage Interest set forth opposite such Member's name on <u>Schedule A</u>.

6.3    <u>Covenants and Restrictions</u>. Upon receipt of the Land, the Company accepted all of the covenants, proffers and restrictions of record on the Land, including but not limited to, those of record in the County, including refinancing the $500,000 letter of credit securing Moncure's (or its Affiliates') obligations to the County and as more particularly described in that certain Deed of Exchange dated August 31, 2004 by and between George V. Moncure V, John Eric Moncure and James Ashby Moncure as Grantors and The Board of Supervisors of Stafford County, Virginia, as Grantee and recorded among the land records of the County. The current guarantor under such letter of credit shall be a third party beneficiary to this Operating Agreement and shall have the right to enforce its indemnification rights with respect to such letter of credit against the Company.

6.4    <u>Financing</u>.

(a)    The Manager may obtain market-rate institutional revolving development and construction financing on the Land. It is the intent and desire of the Members that such loan(s) be in the amount of the acquisition cost of the Land (including, but not limited to, the purchase price payable under the VCV Purchase Agreement) plus all projected costs of the development of the Project (including, without limitation, all on-site and off-site improvements, but not including any work on Additional Land purchased by the Company pursuant to Article IV above). Any acquisition loans and/or loans funding the development and construction of infrastructure (including, without limitation, roads, utilities, stormwater management and off-site improvements) benefiting the entire Land shall be secured by a deed of trust encumbering the

entire Land and shall be non-recourse with respect to the Members. Any development and construction loan(s) funding the construction of a building or buildings shall be secured by a first deed of trust encumbering only the portion of the Land on which the building or buildings are actively being constructed at any given time and shall be non-recourse with respect to the Members. It is specifically agreed that neither Moncure nor any Affiliate of Moncure, shall be required to provide any guaranty of any such loan. However, in the event (if agreed to by all Members) a Member (or its Affiliate) provides such a loan guaranty, there shall be no guaranty fee or other preferential payment to such person. In addition, (a) the lender shall not be the lender under any Member's (or its Affiliates') corporate line of credit, and (b) the loan documents for any such loan shall not include provisions for cross-defaults to any other loans made to any Member or to any Affiliate of any Member. The Manager shall finalize the terms and conditions of the development and construction loan(s) as well as choose the lender at the earliest date practical.

(b)     The Manager, on behalf of the Company, shall be entitled to borrow funds from any Member or any Affiliate of a Member to provide additional equity financing. The interest rate on any such financing shall equal the Prime Rate plus one percent (1%). Any acquisition loans and/or loans funding the development and construction of infrastructure (including, without limitation, roads, utilities, stormwater management and off-site improvements) benefiting the entire Land shall be secured by a deed of trust encumbering the entire Land and shall be non-recourse with respect to the Members. Any development and construction loan(s) funding the construction of a building or buildings shall be secured by a first deed of trust encumbering only the portion of the Land on which the building or buildings are actively being constructed at any given time and shall be non-recourse with respect to the Members. It is specifically agreed that neither Moncure nor any Affiliate of Moncure, shall be required to provide any guaranty of any such loan.

6.5     <u>Capital Accounts</u>.  A Capital Account shall be established and maintained for each Member by the Company in the manner provided under, and in accordance with, Treasury Regulation §1.704-1(b)(2)(iv), as amended, and in accordance with the other provisions of Treasury Regulation §1.704-1(b) that must be complied with in order for the Capital Accounts of the Members to be determined and maintained in accordance with the provisions of Treasury Regulation §1.704-1(b)(2)(iv).   In furtherance of and consistent with the foregoing, each Member's Capital Account (a) shall be increased by (i) the amount of money contributed by such Member to the Company, (ii) the fair market value of property contributed by such Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to by Section 752 of the Code); provided, however, that the contribution of the Land to the Company shall be credited to the respective Member's Capital Accounts as set forth in Section 6.1, and (iii) allocations to such Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treas. Reg. §1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treas. Reg. §1.704-1(b)(4)(i), and (b) shall be decreased by (i) the amount of money distributed to such Member by the Company, (ii) the fair market value of property distributed to such Member by the Company (net of liabilities secured by the distributed property that such Member is considered to assume or take subject to by Section 752 of the Code), (iii) allocations to such Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code, and (iv)

allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treas. Reg. §1.704-1(b)(2)(iv)(g), but excluding items of loss and deduction described in Treas. Reg. §1.704-1(b)(4)(i) or §1.704-1(b)(4)(iii). The Members' Capital Accounts also shall be maintained and adjusted as permitted by the provisions of Treas. Reg. §1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treas. Reg. §§1.704-1(b)(2)(iv) and §1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treas. Reg. § 1.704-1(b)(2)(iv)(g). A Member with more than one Interest shall have a single Capital Account that reflects all of its Interests, regardless of the class of Interests owned by such Member and regardless of the time or manner in which those Interests were acquired. On the Transfer of all or part of an Interest, the Capital Account of the transferor that is attributable to the Transferred Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. §1.704-1(b)(2)(iv)(1).

6.6    Return of Capital Contributions. Except as otherwise provided in Section 12.1 or in the Act, no Member shall have the right to withdraw, or receive any return of, its Capital Contribution.

6.7    Interest. No interest shall be paid by the Company on Capital Contributions or on balances in the Members' Capital Accounts.

6.8    Loan to Moncure. Concurrent with the closing of the loan(s) for development and construction financing on the Land pursuant to Section 6.4, the Company shall make a loan to Moncure in the principal amount of $1,040,000. The loan shall be interest free and shall be repaid from Moncure's portion of cash distributions from the Company as they are made from time to time until all of such principal has been repaid. Provided, however, if Moncure exercises its withdrawal rights in accordance with Section 12.1, the loan shall be accelerated and due and payable, in full, upon the date that all or a portion of the Land is withdrawn from the Company.

## ARTICLE VII
## ALLOCATIONS AND DISTRIBUTIONS

7.1    Allocation of Income and Loss.

(a)    Except as may be required by Section 704(c) of the Code and Treas. Reg. §1.704-1(b)(2)(iv)(f)(4), the income, gains, losses, deductions and credits (or items thereof) of the Company shall be shared by the Members in accordance with the Members' Percentage Interests for tax purposes.

(b)    Reserved.

(c)    Minimum Gain Chargeback. Except as otherwise provided in Treas. Reg. § 1.704-2(f) and notwithstanding any other provision of this Article VII, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal

Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treas. Reg. § 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treas. Reg. §§ 1.704-2(f)(6) and 1.704-2(j)(2). This Section 7.1(c) is intended to comply with the minimum gain chargeback requirement in Treas. Reg. § 1.704-2(f) and shall be interpreted consistently therewith.

(d)    Member Minimum Gain Chargeback. Except as otherwise provided in Treas. Reg. § 1.704-2(i)(4) and notwithstanding any other provision of this Article VII, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treas. Reg. § 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treas. Reg. § 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treas. Reg. §§ 1.704-2(i)(4) and 1.704-2(j)(2). This Section 7.1(d) is intended to comply with the minimum gain chargeback requirement in Treas. Reg. § 1.704-2(i)(4) and shall be interpreted consistently therewith.

(e)    Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treas. Reg. § 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6), items of income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article VII have been tentatively made as if this Section were not applicable.

(f)    All items of income, gain, loss, deduction, and credit allocable to any Interest that may have been transferred shall be allocated between the transferor and the transferee based upon an interim closing of the books as of the date of the Transfer, provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Code and the regulations thereunder.

(g)    If, at any time during the Company's existence, any Member contributes to the Company property with an adjusted basis to the contributing Member which is more or less than the agreed fair market value and such property is accepted by the Company at the time of its contribution, the taxable income, gain, loss, deductions, and credits with respect to such contributed property for tax purposes only (but not for purposes of calculating the Members' respective Capital Accounts) shall be shared among the Members so as to take account of the variation between the basis of the property to the Company and its agreed fair market value at the time of contribution, pursuant to Section 704(c) of the Code using the traditional method. Except as provided in this Section 7.1(g), all allocations shall be made in the same manner as prescribed in this Section 7.1.

7.2    Determination of Income and Loss.   At the end of each fiscal year of the Company, income, gain, loss, deduction and credit (or items thereof) shall be determined for the accounting period then ending and shall be allocated to the Members in accordance with this Article VII.

7.3    Cash Distributions.   Commencing no later than the end of the Company's first fiscal year, the Manager shall, at least semi-annually, distribute the Net Cash Flow to the Members.   Such distributions shall be made in accordance with the Members' respective Percentage Interests.

7.4    Distributions of Other Property.   From time to time, the Members also may cause Property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their respective Percentage Interests and may be made subject to existing liabilities and obligations.   Immediately prior to such distribution, the Capital Accounts of the Members shall be adjusted as provided in Treas. Reg. § 1.704-1(b)(2)(iv)(f).

## ARTICLE VIII
## OWNERSHIP OF COMPANY PROPERTY

The Company Property shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Property or any portion thereof.  Title to any or all Company Property shall be held in the name of the Company and not in the name of any Member, any Affiliate or any nominee of either of the foregoing.  All Company Property shall be recorded as the property of the Company on its books and records.

## ARTICLE IX
## FISCAL MATTERS; BOOKS AND RECORDS

9.1    Bank Accounts; Investments.   Cash Capital Contributions, revenues and any other Company funds shall be deposited in a bank account or accounts established in the name of the Company, or shall be invested in furtherance of the purpose of the Company.  No other funds shall be deposited into Company bank accounts or commingled with Company investments. Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company's purpose, to pay Company debts or obligations or to be distributed to the Members pursuant to this Operating Agreement.  All checks shall require the signature of the Manager.

9.2    Records Required by Act, Right of Inspection.

(a)    Records Required.   During the term of the Company, the Manager shall maintain in the Company's principal office in the United States specified in Section 3.2 hereof all records required to be kept pursuant to the Act (the "Statutory Records").

(b)    Right of Inspection.   On written request at any time or from time to time, a Member may examine, inspect and/or copy in person, at any reasonable time, for any proper

purpose, and at the Member's expense (other than Statutory Records, which, upon request, shall be provided to such Member at the sole cost of the Company), any Company records required to be maintained under the Act.

9.3   <u>Books and Records of Account</u>. The Company shall maintain adequate books and records of account that shall be maintained on the accrual basis method of accounting and on a basis consistent with the appropriate provisions of the Code, containing, among other entries, a Capital Account for each Member.

9.4   <u>Tax Returns and Information</u>. The Members intend for the Company to be treated as a partnership for tax purposes. Each Member, by execution or acceptance of this Operating Agreement, covenants and agrees that it will file its own Federal and state income and other tax returns in a manner that is consistent with the tax classification of the Company as a partnership and will not take any action which is inconsistent with such classification.

9.5   <u>Fiscal Year</u>. The Company's fiscal year shall end on December 31 of each calendar year.

9.6   <u>Tax Matters Partner</u>. SHS Quantico, LLC shall be the Company's "tax matters partner" pursuant to Section 6231(a)(7) of the Code.

9.7   <u>Reimbursements</u>. The parties hereto agree that they or their Affiliates have incurred expenses associated with the Land which shall either be reimbursed or shall be paid by the Company on their behalf, all as shown on <u>Schedule C</u>.

**ARTICLE X**
**MANAGEMENT OF THE COMPANY**

10.1   <u>Manager</u>. Except as otherwise expressly provided in this Operating Agreement, the business and affairs of the Company shall be vested in, managed and controlled by the Manager. The Members designate SHS to manage the day-to-day affairs of the Company (the "Manager"). Except as otherwise provided in this Operating Agreement, SHS shall be able to bind the Company, as authorized in the Operating Agreement, without the knowledge and consent of the Members.

(a)   The Manager shall (i) conduct the business of the Company on a day-to-day basis, and will use commercially reasonable efforts to conduct the business of the Company, and (ii) perform the duties assigned to it under this Operating Agreement. The Manager shall maintain the principal office of the Company in Virginia.

(b)   The Manager will use its commercially reasonable efforts to satisfy the administrative requirements of the Company in the same manner and using the same degree of care that it exercises in the performance of similar work for its own account.

(c)   All costs and expenses incurred by the Manager in carrying out its duties and responsibilities under this Operating Agreement shall be costs and expenses of the Company.

Exhibit A

10.2    Action Without a Meeting.  Any action required or permitted to be taken at any meeting may be taken without a meeting, without prior notice and without a vote if a consent in writing, setting forth the action so taken, is signed on behalf of each Member; provided, however, that any solicitation for a written consent and any supporting information shall be sent to all Members in the same manner and at approximately the same time.

10.3    No Compensation.  The Manager shall not be entitled to compensation for acting as Manager.

10.4    Employment of Others.  The Manager shall be authorized to appoint, employ or contract with, at the expense of the Company, any Person (including the Affiliate(s) of the Members) which the Manager may deem necessary or desirable for the transaction of the business of the Company (including the Affiliate(s) of the Members).

10.5    Third Party Obligations.  All debts and liabilities to any third Persons incurred by the Manager with respect to the development, construction, administration and maintenance of the Project in accordance with this Operating Agreement shall be the debts and liabilities of the Company only, and the Manager shall not be liable for any such obligations by reason of its management, supervision and direction of the various aspects of the Project for the Company in accordance with the terms of this Operating Agreement.

10.6    Engagement and Termination of Developer.  The Manager shall be entitled to select and retain the Developer and approve the terms of any such engagement, subject to the approval of Moncure, which approval shall not be unreasonably withheld or delayed.  All compensation or fees payable to the Developer (other than expense reimbursements) shall be paid by SHS and shall not be an obligation of the Company.  If Developer is in default under the agreement between the Company and the Developer, Moncure shall have the right to require the Manager to terminate the Developer and replace the Developer with a new Developer selected by the Manager, provided that any such new Developer shall be subject to the approval of Moncure, which approval shall not be unreasonably withheld or delayed.  All compensation or fees payable to any such new Developer (other than expense reimbursements) shall be paid by SHS and shall not be an obligation of the Company, provided that such compensation and fees are consistent with the then current prevailing fees in the market payable to third party developers for comparable services.

**ARTICLE XI**
**RIGHTS, POWERS AND OBLIGATIONS OF MEMBERS**

11.1    Authority, Liability to Third Parties.  Except as otherwise expressly set forth in this Operating Agreement, no Member has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company.  No Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment, decree or order of a court, except that a Member shall remain liable to the other Members and/or the Company (but not to third parties) for such

13

Exhibit A

Member's fraud, willful misconduct, gross negligence or an intentional breach of any material provision of this Operating Agreement.

11.2    Transfers of Interests.    No Member shall cause there to be a Transfer of Interests in the Company such that the Member fails legally and beneficially to own, directly or indirectly, all of the ownership Interest held by such Member in the Company, without the prior consent of all Members, in each such other Member's sole and absolute discretion.    The parties acknowledge that the relationships of the Members to each other and the consent rights contained hereunder are personal in nature and, as a result, the Members have consented to the Transfer restrictions contained in this Operating Agreement, notwithstanding the fact the same may restrict a Member's right to alienate its Interest in the Company.

11.3    Effect of Transfer of Interest.    A Transfer of an Interest does not entitle the transferee to become, or to exercise rights or powers of a Member, without the consent of all Members in their sole and absolute discretion.    A Transfer only entitles the transferee to receive cash distributions and allocations of Company profits, losses and other tax incidents to the extent of the Interest Transferred.    Until the transferee is admitted as a Member pursuant to Section 11.4 below, (i) the transferor Member shall continue to be a Member and to be entitled to exercise any rights or powers of a Member with respect to the Interest Transferred, and (ii) such transferor Member shall continue to be liable for all of its obligations, liabilities and responsibilities contained in this Operating Agreement.

11.4    Admission of Transferee as Member.    A transferee of a Member's Interest desiring to be admitted as a Member must execute a counterpart of, or an agreement adopting, this Operating Agreement.    The admission of such transferee is subject to the unanimous approval of the Members.    Upon admission of the transferee as a Member, the transferee shall have, to the extent of the Interest Transferred, the rights and powers and shall be subject to the restrictions and liabilities of a Member under this Operating Agreement, the Articles of Organization and the Act.    The transferee shall also be liable, to the extent of the Interest Transferred, for the unfulfilled obligations, if any, of the transferor Member to make Capital Contributions, but shall not be obligated for liabilities unknown to the transferee at the time such transferee was admitted as a Member and that could not be ascertained from this Operating Agreement.    Whether or not the transferee of an Interest becomes a Member, the transferor Member is not released from any liability to the Company under this Operating Agreement, the Articles of Organization or the Act.

11.5    No Encumbrance.    No Member may pledge or encumber its Interest in the Company as security for any financial obligation, whether or not related to the business of the Company, except as otherwise specifically provided above in Section 6.3 or for the purpose of settling potential litigation against Affiliates of Moncure related to the Land.

11.6    No Withdrawal.    Except as provided in Section 12.1, no Member shall have any right to voluntarily resign or otherwise withdraw from the Company without the consent of all Members.    In the event of any permitted withdrawal, on and as of the effective date of a Member's withdrawal from the Company under the provisions of this Operating Agreement, such former Member shall cease to have any Interest or any management or other rights, status

14

or privileges of a Member, but such former Member shall not be released or discharged from any of the obligations of a Member under the provisions of this Operating Agreement, unless provided in the written consent of all Members.

11.7   Other Business.   Other than as provided in Section 4.2, the Manager and the Members may engage in or possess interests in other business ventures (unconnected with the Company) of every kind and description, independently or with others, including businesses competitive with that of the Company.   Neither the Company nor the other Members shall have any rights in or to such independent ventures or the income or profits therefrom.

11.8   No Representations with Respect to Land.   Moncure does not make any representations nor warranties with respect to the Land.   It is contributed to the Company "as is" and "where is."

# ARTICLE XII
## DISSOLUTION AND WINDING UP

12.1   Moncure Withdrawal Rights.   The parties acknowledge that Moncure will contribute all of the Land to the Company.   If Development of the Land has not commenced by June 30, 2006, Moncure may give Notification to the Members and the Manager of its intention to withdraw the Land from the Company.   The Notification referred to in this paragraph shall be delivered to each Member and Manager and shall provide that Moncure shall withdraw the Land (or portion thereof) by a date thirty (30) days after the date of the Notification unless the underlying circumstances giving rise to the Notification are cured within such thirty day period. Unless the underlying circumstances giving rise to the Notification are cured within such period, the Manager shall convey the withdrawn Land to Moncure on such thirtieth $(30^{th})$ day free of all liens except for (i) any liens of record at the time the Land was conveyed to the Company and (ii) any liens on the Land related to debt incurred pursuant to Section 6.4.   Upon any such conveyance, Moncure shall not be required to reimburse the Manager for any expenses the Manager incurred on behalf of the Company.   Also, on such thirtieth $(30^{th})$ day, Moncure shall deliver cash or cash equivalent to the Company to reimburse the Company for any loans outstanding to Moncure under Section 6.9.

12.2   Other Events Causing Dissolution.   The Company shall be dissolved, the Company Property shall be disposed of, and its affairs wound up, in accordance with the Act.

12.3   Deficit Capital Accounts.   Notwithstanding anything to the contrary contained in this Operating Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Operating Agreement, upon dissolution of the Company, such deficit shall not be an asset of the Company, and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

Exhibit A

## ARTICLE XIII
## INSURANCE, BONDS AND LETTERS OF CREDIT

13.1   <u>Indemnification</u>.   The Company shall indemnify, save harmless and pay all judgments arising against the Manager, the Members, and each Member's and Manager's respective shareholders, directors, employees, members and agents from any cost, expense, claim, liability or damage incurred by reason of such Person's relationship to the Company or any act performed or omitted to be performed by them in connection with this Agreement or the business of the Company in accordance with the provisions of this Operating Agreement, including reasonable attorney's fees and costs incurred by them in connection with the defense of any action based on any such act or omission, which attorney's fees and costs may be paid as incurred, including all such liabilities under any Federal or state securities act (including the Securities Act of 1933, as amended) as permitted by law, except that the Company shall have no indemnification obligation hereunder with respect to any act or omission of any Person that constitutes fraud, willful misconduct or an intentional breach of any material provision of this Operating Agreement. All judgments against the Company with respect to which any Person is entitled to indemnification may only be satisfied from the Company Property. Any Person entitled to be indemnified hereunder shall also be entitled to recover its reasonable attorney's fees and costs of enforcing this indemnity from the Company Property.

13.2   <u>Insurance</u>.   The Company may purchase and maintain insurance or other arrangements on behalf of any Person who is or was a Member, employee, agent or other Person identified above in Section 13.1 against any liability asserted against him or incurred by him in such a capacity or arising out of his status as such, whether or not the Company would have the power to indemnify him against that liability under this Article or otherwise.

The Manager shall cause the Developer to name the Company as an additional named insured on its commercial general liability policy.  The limits for such policy shall not be less than $10,000,000 covering the Company.

13.3   <u>Limit on Liability of Members</u>.  The indemnification set forth in this Article shall in no event cause the Members to incur any personal liability beyond their total Capital Contributions, nor shall it result in any liability of the Members to any third party.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

14.1   <u>Entire Agreement</u>.   This Operating Agreement, including all exhibits and schedules attached hereto, contains the entire agreement between the Members relating to the subject matter hereof, and all prior agreements and operating agreements relative hereto which are not contained herein are terminated.

14.2   <u>Law Governing</u>.   This Operating Agreement shall be governed by and construed in accordance with the local, internal laws of the Commonwealth of Virginia.  In particular, this Operating Agreement is intended to comply with the requirements of the Act and the Articles of Organization.   In the event of a direct conflict between the provisions of this Operating

16

Exhibit A

Agreement and the mandatory provisions of the Act or any provision of the Articles of Organization, the Act and the Articles of Organization, in that order of priority, will control.

14.3    Successors and Assigns.  This Operating Agreement shall be binding upon and shall inure to the benefit of the Members and, subject to the restrictions upon Transfer of a Member's Interest set forth elsewhere in this Operating Agreement, their respective successors and assigns.

14.4    Severability.    This Operating Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations.  If any provision of this Operating Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, but the extent of such invalidity or unenforceability does not destroy the basis of the bargain between the Members as expressed herein, the remainder of this Operating Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

14.5    Headings.    The Article and Section headings appearing in this Operating Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article or Section.

14.6    Construction.   Whenever required by the context, as used in this Operating Agreement, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter.  Unless expressly stated herein, all references to Articles refer to articles of this Operating Agreement, and all references to Schedules are to schedules attached hereto, each of which is made a part hereof for all purposes.

14.7    Offset.  Whenever the Company is to pay any sum to any Manager or Member, any amounts that such Person owes the Company may be deducted from that sum before payment.

14.8    Effect of Waiver or Consent.  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

14.9    Further Assurance.   In connection with this Operating Agreement and the transactions contemplated hereby, each party shall execute and deliver any additional documents and instruments, and perform any additional acts, that may be necessary or appropriate to effectuate and perform the provisions of this Operating Agreement and those transactions.

Exhibit A

14.10  Waiver of Certain Rights.  Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the Property of the Company.

14.11  Counterparts and Binding Effect.  This Operating Agreement may be executed in counterparts, each of which shall be an original, but all of which taken together shall constitute a single document.  This Operating Agreement shall be binding upon the Manager and each Member as evidenced by their signatures below.

14.12  Attorney's Fees.  If any party becomes involved in litigation or proceedings arising out of this Operating Agreement or the performance hereof, the court or tribunal in such litigation or proceeding, or in a separate suit, shall award attorney's fees to the prevailing party.  Unless judgment goes by default, the attorney fee award shall not be computed in accordance with any court schedule, but shall be such as to fully reimburse all attorney's fees actually incurred in good faith, regardless of the size of the judgment, it being the intention of the parties to fully compensate for all the attorney's fees paid or incurred in good faith.

14.13  Amendment of Agreement.  This Operating Agreement may be amended only in writing, in whole or in part, at any time only by the execution thereof of the unanimous consent of the Manager and the Members, as the context shall require.  No provision of this Operating Agreement may be waived except by a writing signed by the party to be charged therewith.  This Section may be amended only with the unanimous consent of the Manager and the Members.

14.14  Notifications.  Notifications, as defined above, given under this Operating Agreement shall be duly given to the appropriate addresses and telecopy numbers set forth below (or to such other addresses and telecopy numbers as a party may designate as to itself by Notification to the others):

| | |
|---|---|
| If to Moncure: (of Affiliates) | Moncure Brothers, LLC c/o James A. Moncure, Manager 179 Bells Hill Avenue Stafford, VA  22554 Telephone No.:  (540) 907-1282 Telecopy No.:  (540) 720-7368 |
| If to SHS: | c/o B. Judson Honaker, Jr. 1201 Central Park Boulevard Fredericksburg, VA  22401 Telephone No.:  (540) 786-1447 Telecopy No.:  (540) 786-1406 |

Exhibit A

With a copy to:
c/o Samer E. Shalaby
159 Lichfield Boulevard, Suite 101
Fredericksburg, VA 22407
Telephone No.: (540) 368-1327
Telecopy No.: (540) 368-9001

With a copy to:
c/o Larry D. Silver
1001 East Telecom Drive
Boca Raton, FL 33431
Telephone No.: (561) 981-5252
Telecopy No.: (561) 981-5253

14.15  Incorporation by Reference. Every exhibit, schedule and other appendix attached to this Operating Agreement and referred to herein is incorporated in this Operating Agreement by reference unless this Operating Agreement expressly provides otherwise. Any exhibit or schedule not available at the time this Operating Agreement is executed shall be agreed upon, initialed and attached by the parties as soon after execution as it is practicable, but failure to attach any exhibit or schedule shall not affect the validity of this Operating Agreement unless the parties are in material disagreement as to the contents of such exhibit or schedule.

14.16  Not for Benefit of Creditors. The provisions of this Operating Agreement are intended only for the regulation of the relations among the parties and the Company, and this Operating Agreement shall be enforceable only by those persons upon whom it is binding and to whom it inures. This Operating Agreement is not intended for the benefit of any third-party creditors or assignees of the parties and does not grant any rights to or confer any benefits on any creditor or other party who is not a party.

14.17  Notification and Cure Period. In no event shall a party be deemed in default hereunder unless such Member has received Notification of such default from the Company or from another party and has failed to cure such default within ten (10) Business Days after receiving such Notification (or, in the event of any non-monetary defaults which cannot be cured within such ten (10)-Business Day period, has failed to begin the cure within such ten (10)-Business Day period and to pursue diligently the cure to completion). In the event other provisions of this Operating Agreement provide for a different notice and cure period, the notice and cure period provided in such other provisions and the notice and cure period provided in this Section shall run concurrently.

14.18  Title to Land. Moncure is an Affiliate of James A. Moncure, John E. Moncure and George V. Moncure V, the owners of the Land. Moncure agrees to take all actions necessary to cause the Land to be contributed to the Company pursuant to Section 6.1 hereof.

19

Exhibit A

IN WITNESS WHEREOF, the Manager and the Members of the Company have evidenced the adoption of this Operating Agreement by their signatures below, such adoption to be effective as of September 11, 2005.

MONCURE BROTHERS, LLC
a Virginia limited liability company

_____ [SEAL]
James A. Moncure, Manager

SHS QUANTICO, LLC
a Virginia limited liability company

By:_____ [SEAL]
Name: B. Judson Honaker, Jr., President

20

Exhibit A

## LIST OF SCHEDULES

Schedule A    -    Members, Capital Contributions and Percentage Interests

Schedule B    -    Description of Land

Schedule C    -    Reimbursements to or on behalf of Members

Schedule D    -    VCV Purchase Agreement

Exhibit A

## Schedule A

Members, Capital Contributions, Percentage Interests

| Name of Member | Capital Contribution | Percentage Interest |
|---|---|---|
| Moncure Brothers, LLC | $500.00 | 50% |
| SHS Quantico, LLC | $500.00 | 50% |

Exhibit A

Schedule B

Description of Land

Real property containing 84.436 acres, more or less, in Aquia Magisterial District (formally, Griffis-Widewater Magisterial District) of Stafford County, Virginia and commonly referred to as Fritter Park.

a.k.a TM #13-67, as more fully described in a Deed of Exchange dated August 31, 2004 and recorded as Instrument No. LR040033475 in the Clerk's Office of the Circuit Court of Stafford County, Virginia, by and between The Board of Supervisors of Stafford County, Virginia, as Grantor and George V. Moncure V, John Eric Moncure and James Ashby Moncure, as Grantees.

Exhibit A

## Schedule C

### Reimbursements to or on behalf of Members

| | |
|---|---|
| Scott Gentilucci | $50,000 |
| T. Campbell | $110,000 |
| Samer E. Shalaby | $110,000 |
| Settlement with Eilerson | Pursuant to the terms contained in the attached VCV Purchase Agreement. |
| George L. Gordon, Jr. | ($2,500/mo. beginning 8/04 until 12/05 and $500,000 if Stafford calls in the letter of credit) |

Exhibit A

## Schedule D

## VCV Purchase Agreement

#1226360 v1    018622.03377

Exhibit A

## SECOND AMENDMENT TO PURCHASE AGREEMENT

THIS SECOND AMENDMENT TO PURCHASE AGREEMENT is made as of January 6, 2006, between VIRGINIA CENTER VENTURES LLC ("Seller") and QUANTICO BUSINESS CENTER LLC ("Purchaser") and amends that certain Purchase Agreement between Seller and Purchaser dated November 22, 2005, as amended by First Amendment dated as of December 22, 2005 (the "Agreement").

In consideration of Ten Dollars ($10.00) and other good and valuable consideration the parties hereto agree and amend the Agreement as follows:

1.       Paragraph 4 is hereby amended to change the date for "Settlement" from December 31, 2005 to February 28, 2006 or such sooner date as elected by Purchaser upon 10 days prior written notice.  If Settlement has not occurred by Jan 31, 2006, then beginning on February 1, 2006 and continuing until the actual date of Settlement, the Purchase Price shall bear interest at six percent (6%) compounded annually, such interest to accrue and be payable in full at Settlement.

2.    Paragraph 17 is hereby deleted  in its entirety

3.    Seller represents and confirms that no notice of renewal has been given by the tenant under that certain lease between Hilldrup Properties, Inc and Columbia Propane Corporation, dated September 14, 2000, subsequently assigned to Seller.  Seller further represents that the early termination/relocation rights under the Agreement to Terminate Lease between Edge Development Company LLC and Amerigas Propane LP were never exercised and  no unfulfilled obligations exist under such Agreement as of the date hereof   All tenants of the Property are currently in possession on a month to month basis only, except for the lease with Max Barentine T/A the Sportsman Center which lease expires on May 31, 2006 and has not been further extended. The forgoing shall survive Settlement.

4.     Except as set forth above, all terms, covenants, conditions and provisions of the Sales Agreement are hereby ratified and affirmed and shall continue in full force and effect.

WITNESS the following signatures:

VIRGINIA CENTER VENTURES, LLC
a Virginia limited liability company

By: _____

Name:  Thomas O. Eilerson

Title:  Manager

Exhibit A

QUANTICO BUSINESS CENTER LLC
a Virginia limited liability company

By: _____

Name: B. Judson Hobker, Jr.

#732986 v2    018622.03877



## FIRST AMENDMENT TO PURCHASE AGREEMENT

THIS FIRST AMENDMENT TO PURCHASE AGREEMENT is made as of December 22, 2005, between VIRGINIA CENTER VENTURES LLC ("Seller") and QUANTICO BUSINESS CENTER LLC ("Purchaser") and amends that certain Purchase Agreement between Seller and Purchaser dated November 22, 2005 (the "Agreement").

In consideration of Ten Dollars ($10.00) and other good and valuable consideration the parties hereto agree and amend the Agreement as follows:

1.      Paragraphs 3(a)(i) and 3(a)(iii) are amended to change the expiration date for the "Inspection Period" from December 5, 2005 to January 6, 2006.

2.      Paragraph 4 is hereby amended to change the date for "Settlement" from December 31, 2005 to January 31, 2006.

3.      Paragraph 17 is hereby amended and restated in its entirety as follows:

This Agreement may be terminated by either Seller or Purchaser after January 31, 2006 if Purchaser has not then obtained a final executed Operating Agreement with the Moncure Family providing for acquisition by Purchaser of the Fritter Park portion of the Assemblage by January 31, 2006. The foregoing condition shall be deemed satisfied and waived if, on or before January 31, 2006, Purchaser gives written notice confirming same or delivers the Purchase Price and other closing documents to Land America with instructions to close.

4.      Except as set forth above, all terms, covenants, conditions and provisions of the Sales Agreement are hereby ratified and affirmed and shall continue in full force and effect.

WITNESS the following signatures:

VIRGINIA CENTER VENTURES, LLC
a Virginia limited liability company


By:_____
Name:_____
Title:_____


QUANTICO BUSINESS CENTER, LLC
a Virginia limited liability company

By:_____
Name: B. JUDSON HONAKER, JR.

Exhibit A

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT ("Agreement"), is made as of the 23nd day of November, 2005, by VIRGINIA CENTER VENTURES, LLC, a Virginia limited liability company ("Seller") and QUANTICO BUSINESS CENTER, LLC, a Virginia limited liability company ("Purchaser").

### RECITALS

Seller owns approximately 2.11 acres of real property, located at 4011 Jefferson Davis Highway, Stafford County, Virginia, as more particularly described on Exhibit A attached hereto (the "Property").

Seller wishes to sell the Property and Purchaser wishes to purchase the Property on the following terms and conditions.

### AGREEMENT

In consideration of their mutual promises hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, the parties hereto covenant and agree as follows:

Exhibit A

1.    Contract for Purchase and Sale.  This Agreement shall constitute a binding contract, on the terms and conditions herein set forth, for the purchase and sale of the Property.

2.    Purchase Price.  (a) The consideration for the Property shall be Four Million Three Hundred Fifty Thousand and No/100 Dollars ($4,350,000.00) (the "Purchase Price").  The Purchase Price reflects a purchase in gross, and not by the acre, and shall be paid as follows:

(i)    There shall be no deposit required under this Agreement.

(ii)    The amount of Two Million and 00/100 Dollars ($2,000,000.00) shall be paid in cash or by wire transfer to Seller or Seller's designated Qualified Exchange Intermediary, as directed by Seller, at closing.

(iii)    The amount of up to Two Million Three Hundred Fifty Thousand and 00/100 Dollars ($2,350,000.00) shall be paid after closing in the amounts and at the times provided below (the "Deferred Purchase Price").  The Deferred Purchase Price shall be evidenced by a deferred purchase money promissory note, made by Purchaser, reflecting the amounts that may become due and payable under 2(b) below, and shall incorporate the provisions of 2(b) but otherwise shall not reflect the accrual of any interest nor a specified maturity date.  The Note shall be in form and substance mutually acceptable to Seller and Purchaser.

(b)    The Deferred Purchase Price shall be determined and payable as follows:

2

Exhibit A

    (i)  The Deferred Purchase Price shall equal the product of $5.00 multiplied by the total square feet (but in no event more than 470,000 square feet) of building improvements developed or deemed to be developed by Purchaser on the assemblage of property more commonly known as "Fritter Park", to be acquired by Purchaser, including the Property, which is more particularly described on Exhibit B attached hereto (the "Assemblage"). The Deferred Price shall be determined and paid as, and to the extent, provided in subclauses (ii), (iii) and (iv) below.

    (ii)  The determination of the Deferred Purchase Price applicable to buildings constructed on the Assemblage by Purchaser or an "Affiliate" (an "Affiliate" is any entity or party in which any equity owner, whether direct or indirect, regardless of degree of removal, of Purchaser owns any equity interest, whether direct or indirect, regardless of degree of removal, or exercises, directly or indirectly, any degree of management authority or control) which are owned by Purchaser or an Affiliate for the purpose of sale, lease or other disposition to "Unaffiliated Third Party" ("Unaffiliated Third Party" means any party that is not an Affiliate of Purchaser) shall be made by multiplying the gross square footage of the applicable building by $5.00. The payment of the Deferred Purchase Price attributable to the development of such building shall be due upon the earlier to occur of: (a) in the event a building is developed by Purchaser or any Affiliate for the purpose of leasing space in such building, the Deferred Purchase Price as to such building shall be payable on the earlier to occur of occupancy by the first tenant of space within the Building or the commencement date of the first lease of space

3

Exhibit A

within the building, or (b) in the event such a building is sold by Purchaser or an Affiliate, the

date upon which a deed is recorded conveying title to the improvements to the Unaffiliated Third

Party.

        (iii)    Notwithstanding the provisions of paragraph 2(b)(ii) above, if (a) a

building is constructed for lease or sale by Purchaser or an Affiliate, and (b) the approved plan of

development and/or site plan and/or approved zoning case ("Development Approval") provides

that the land being developed for such building pursuant to the applicable Development

Approval is not to be developed in excess of the "Minimum Density Requirement" described

below, then (x) the land subjected to the Development Approval shall be deemed to have been

sold to an Affiliate as provided in paragraph 2(b)(iv) below and (y) the Deferred Purchase Price

shall be calculated in accordance with paragraph 2(b)(iv) below, except the number 8,500 shall

be substituted for the number 11,500 as the Agreed Development Density factor as provided in

paragraph 2(b)(iv) below. The "Minimum Density Requirement" shall mean the requirement to

improve any land submitted for Development Approval to a density in excess of 8,500 square

feet per acre.

        (iv)    The Deferred Purchase Price attributable to any land sold or

ground leased (any lease of unimproved land) to an Affiliate or an Unaffiliated Third Party shall

be five dollars $5.00) multiplied by the "Agreed Development Density" ( as defined below) of

such land . The "Agreed Development Density" as used herein is 11,500 (the proforma

projection of developable square feet of improvements per acre)   multiplied by each acre  of

land conveyed(or deemed conveyed) or ground leased  pursuant to the provisions hereof,

4

Exhibit A

prorated as to less than an acre, to the nearest thousandth. . Payment of the portion of the

Deferred Purchase Price attributable to any such third party sale or ground lease shall be due on

the date upon which, as applicable, (a) a deed is recorded conveying title to the Affiliate or the

Unaffiliated Third Party, or (b) a ground lease has been executed by the Affiliate or the

Unaffiliated Third Party and the term of ground lease has commenced thereunder.

       (v)    Larry D. Silver, B. Judson Honaker, Jr., Samer Shalaby, and James

A. Moncure who are the principal owners of Purchaser (the "Principals") shall execute personal

guarantees (the "Guarantee") at Settlement to unconditionally and jointly and severally guarantee

Purchaser's obligations to pay the Deferred Purchase Price if, as and when it becomes due and

payable as provided above. Seller acknowledges that there is no guarantee, that the entire

Deferred Purchase Price will be earned and therefore that this is a guarantee only of the

Purchaser's obligations to pay the Deferred Purchase Price as, if and when payable in accordance

with the provisions hereof.

       (vi)    Nothing herein shall prevent the transfer or sale of the Property, or

a portion thereof, from Purchaser to an Affiliate. The transfer of any portion of the Property to

an Affiliate (although Purchaser, in its discretion, may elect to pay to pay the Deferred

Consideration at that time) shall not result in the payment of any Deferred Purchase Price,

provided, however, the terms and provisions hereof shall continue to apply to such portion of the

Property and the Affiliate acquiring such land shall remain obligated to pay the Deferred

Purchase Price applicable to that portion of land if, as and when payable in accordance with the

5

Exhibit A

provisions hereof. Further, it is understood and agreed that Seller is entitled to be compensated under either (ii) or (iii) above, but not under both so that a transfer or sale to an Affiliate of an improved portion of the Property shall not result in payment of any Deferred Purchase Price under (iii) if Seller has already been paid consideration under (ii) with respect to the portion of the Property so sold or conveyed. Similarly, if Seller is paid the Deferred Purchase Price computed as provided in (iii) in connection with a sale of a portion of the Property to an Affiliate, then Seller shall have no further claim to payment of any further Deferred Purchase Price with respect to that portion of the Property so sold.

(vii)    No Deferred Purchase Price shall be required to be paid with respect to any portion of the Property required to be dedicated and transferred in fee to Public authorities for public purposes such as land needed for public roads and/or for sewer or water pump station purposes.

(viii)    Purchaser shall, within thirty (30) days after receipt of written request (but in no event more than one time per calendar year), provide to Seller a written report describing the development activities (contracts signed, leases signed, parcels sold, site plans or plans of development submitted for approval and like activities) occurring during the preceding calendar year and contemplated for the then current calendar year.

3.    Conditions Precedent to Obligation of Purchaser.

6

(a)    <u>Inspection Period.</u>

(i)    <u>Right to Inspect.</u>  The period beginning on the date this Agreement
becomes effective having been executed by Purchaser and Seller (the "Effective Date") through
December 5, 2005, is defined as the "Inspection Period".  During the Inspection Period, the
Purchaser, its duly authorized agents and employees shall be entitled to reasonable access to the
Property, for the purpose of inspecting the Property and making surveys, examinations,
measurements, soil tests, engineering and other findings, and undertaking such other activities
related to the use and further development of the Property, provided that such studies do not
result in any material change in the present character of the Property or otherwise cause damage
or waste to the Property.  Seller shall within three  (3) days after the Effective Date deliver to
Purchaser copies of all leases, title reports, surveys, plats, permits, materials and other reports,
including all zoning and environmental reports, and studies, and any and all other documentation
which is described on the Table of Contents of Seller's materials attached as <u>Exhibit C</u> hereto
("Seller's Materials").  If Purchaser does not acquire the Property, Purchaser shall return all
Seller's Materials to Seller.  Additionally, if Purchaser does not acquire the Property, Purchaser
shall provide Seller with any and all reports, studies, plans, surveys and schematic produced by
or for Purchaser as a result of or in connection with Purchaser's study of the Property.  Purchaser
agrees to promptly repair at Purchaser's cost and expense, any damage arising as a result of its
exercise of the right of access granted in this Paragraph and to return the Property to substantially
and materially the same condition it was in as of the date hereof.  Purchaser, for itself and its
members, agrees to indemnify, defend and hold Seller absolutely and completely harmless from
any and all liability, losses, damages, fines, liens (including mechanics' liens), penalties, claims,

7

Exhibit A

personal injury, causes of action, lawsuits and administrative proceedings of any kind or nature

whatsoever as a result of the exercise of such right of access, and the conduct, acts and/or

omissions of Purchaser and Purchaser's agents, contractors or inspectors, other than as a result of

Seller's gross negligence or willful misconduct. Prior to any entry onto the Property, (i)

Purchaser shall require its agents and contractors to procure appropriate policies of Commercial

General Liability Insurance with contractual indemnity coverage in an amount of not less than

$1,000,000 for personal injury and $500,000 for property damage (with Seller named as an

additional insured), and (ii) Purchaser shall give Seller at least three (3) days prior notice so

Seller may give appropriate notice to tenants of the Property. Purchaser shall not disturb or

interfere with the conduct of any tenant's business or operations at the Property. The indemnity

obligations and delivery obligations of Purchaser under this paragraph shall survive termination

of this Agreement.

No invasive testing shall be conducted by Purchaser without prior

notice to and the consent (not to be unreasonably withheld, but which may be reasonably

conditioned) of Seller. Standard soil borings and similar tests shall not be considered invasive.

(ii)     Right to Terminate. This Agreement and all of Purchaser's

obligations hereunder are subject to Purchaser determining to its sole satisfaction prior to the

expiration of the Inspection Period, that all aspects of the Property, including the title to and

environmental condition of the Property and Purchaser's ability to develop and use the Property

are feasible for Purchaser's purposes.

8

If Purchaser in its sole discretion determines that any aspect of the Property is not feasible for Purchaser's purposes, Purchaser shall (i) give written notice thereof to Seller prior to expiration of the Inspection Period; (ii) deliver to Seller to the extent not delivered theretofore, the studies, plans, schematics, surveys and title and engineering reports delivered by Seller to Purchaser and those produced by and/or for Purchaser, its agents and contractors; and (iii) this Agreement shall terminate and both Seller and Purchaser shall thereafter be relieved from any and all liability under this Agreement, except as otherwise specifically provided herein. If Purchaser does not give Seller such written notice of the termination of the Agreement prior to the expiration of the Inspection Period, Purchaser shall become bound under this Agreement without any condition precedent to Settlement, except as specifically provided herein and shall proceed to closing and to purchase the Property.

(iii)    Title and Survey. The Purchaser shall have obtained such title reports and surveys relating to the Property it deems prudent prior to expiration of the Inspection Period. Purchaser shall on or before expiration of the Inspection Period, inform Seller in writing as to any survey or title defects or other objections regarding the Property disclosed by the survey or title commitment that Purchaser is unwilling to accept. Seller shall provide Purchaser with written notice delivered within ten (10) days after receipt of Purchaser's objections, whether Seller is unable or unwilling to cure such survey or title defects or objections to Purchaser's satisfaction; provided, however, that Seller shall be affirmatively obligated to clear and satisfy any liens for real estate taxes and all voluntarily granted monetary encumbrances and shall have no obligation to cure any other objections reported by Purchaser. Any objection which Seller

9

commits to cure must be cured prior to closing.  Seller covenants that it will not record or

otherwise permit creation of any further matters of title without Purchaser's consent.  If Seller

elects not to cure any objection to title where it has such discretion (meaning in all instances

except as specifically limited in the preceding sentence), Purchaser may, at its option, and as its

only alternatives, notwithstanding anything herein contained to the contrary, either (i) terminate

this Agreement by giving Seller written notice of such termination prior to the expiration of the

Inspection Period; (ii) cure such defects or objections at its own expense and proceed to

Settlement with no reduction in the Purchase Price; or (iii) waive such defects, with no reduction

in the Purchase Price.  If Purchaser elects to terminate this Agreement, the parties hereto shall

have no further obligations or liabilities to one another hereunder, except for Purchaser's

indemnity and delivery obligations as provided hereunder.  If Purchaser fails to notify Seller of

any survey or title defects or objections to the Property on or before December 5, 2005,

Purchaser shall be deemed to have approved all matters relating to the survey or title to the

Property disclosed on the survey and the title commitment as of their respective dates.  The

foregoing shall not prejudice Purchaser's rights and remedies in the event Seller breaches its

obligations to cure a title objection in those instances limited above in which it is obliged to do

so.  In the event an intervening matter arises after the date of Purchaser's title exam, the same

notice and cure provisions shall apply.


                    (iv)    Hazardous Materials.  Prior to the expiration of the Inspection

Period, Purchaser shall have procured an environmental site assessment on or before the

expiration of the Inspection Period and be satisfied with the environmental condition of the


                                    10

Property.  If Purchaser finds the results of its environmental investigation unsatisfactory, its only

recourse shall be to terminate this Agreement prior to the expiration of the Inspection Period.


    (b)   <u>Other Conditions.</u>  This Agreement and all of Purchaser's obligations

hereunder are further contingent upon the following:


    (i)   <u>Seller's Deliveries.</u>  At or prior to Settlement, Seller shall have

made all deliveries and otherwise performed all duties required to be delivered or performed at

or prior to Settlement and Seller's representations and warranties shall be true and correct as of

Settlement.


    (ii)   <u>No Material Adverse Change.</u>  No material adverse change shall

have occurred to the Property since the expiration of the Inspection Period.  No intervening

matter of title or survey affecting marketability of title shall have occurred since the date of the

title commitment or survey, as the case may be, obtained by Purchaser during the Inspection

Period.  No violation of any environmental law shall have occurred and no hazardous material or

substance has been introduced into or upon the Property which could result in any liability or any

material expense since the date of Purchaser's environmental study conducted during the

Inspection Period.


    The foregoing conditions precedent are acknowledged to be conditions for the benefit of

the Purchaser and part of the consideration for this Agreement.  Purchaser shall have the right to

waive any or all of such conditions and proceed to purchase the Property with no reduction in the

Purchase Price, provided, however, that any such elective waiver or waivers must be in writing

and given in accordance with the notice provisions of this Agreement.

4.    Settlement.  Settlement of the purchase and sale of the Property shall be made at

the offices of LandAmerica/Lawyers Title, 804 Charles Street, Fredericksburg, Virginia, or at

such other place as the parties may agree upon in writing, on or before December 31, 2005

("Settlement").  Exclusive possession of the Property shall be delivered to Purchaser at

Settlement.  At Settlement, Purchaser shall pay to Seller the Purchase Price to be paid at

Settlement in cash or by funds wired to Seller's account and shall execute the Note and the

Principals shall execute the Guaranty.  Contemporaneously, Seller shall deliver to Purchaser (a)

the Deed (as defined in Paragraph 5); (b) an affidavit for the benefit of Purchaser and its title

insurer, satisfactory to both (the "Affidavit"), stating, inter alia that (i) no right to a mechanic's

or materialman's lien has accrued with respect to the Property as a result of any act or omission

by Seller and (ii) there are no outstanding leases or agreements with regard to, or other parties in

or entitled to possession of, the Property, except for the leases of space within the Property

disclosed in Seller's Materials attached hereto; (c) a Certificate of Non-Foreign Status as

required by Section 1445 of the Internal Revenue Code of 1986 and any other certificates

required by any governmental authority or agency or Purchaser's title insurer.  Seller shall pay

the costs of preparing the Deed and the grantor's tax thereon.  Seller shall pay no other costs

except for the fees and costs of its counsel and the real estate commissions contemplated by this

Agreement.  Purchaser shall pay all costs, title insurance premiums and expenses incurred in

12

Exhibit A

connection with examination of title to the Property and preparation of the survey. Purchaser

and Seller shall each execute the Settlement statement. Purchaser shall pay all costs associated

with the recording of the deed other than the grantor's tax. Real estate taxes shall be prorated

between Seller and Purchaser as of the date of the Settlement, according to the number of days of

the year which the Property is owned or to be owned by each party. Each party shall pay its own

legal, accounting and other expenses incurred in connection with this Agreement or Settlement

hereunder.

5.      The Deed. At Settlement, Seller shall deliver to Purchaser a general warranty

deed with English covenants of title (the "Deed") conveying to Purchaser good and marketable

fee simple title to the Property pursuant to the survey, free and clear of all liens, encumbrances,

conditions and restrictions except (i) the lien for real estate taxes not yet due and payable; (ii)

existing leases; and (iii) any liens, encumbrances, conditions, restrictions or other objections to

title which Purchaser has accepted or is deemed to have accepted hereunder.

6.      Risk of Loss. The risk of loss or damage to the Property by fire or other casualty

prior to Settlement shall be on Seller. If such loss or damage materially and adversely affects

Purchaser's intended use and enjoyment of the Property as of Settlement, Purchaser shall be

entitled to terminate this Agreement and the parties hereto shall have no further obligations or

liabilities to one another hereunder.

13

7.    Condemnation.  If, prior to Settlement, any taking pursuant to the power of

eminent domain is proposed or occurs, as to all or any portion of the Property intended to be

acquired at Settlement by Purchaser, or sale occurs in lieu thereof, Purchaser shall be entitled to

elect either to (i) terminate this Agreement, or (ii) proceed to Settlement, in which event, all

proceeds, awards and other payments arising from any such taking or sale shall be paid to

Purchaser, with no adjustment of the Purchase Price paid at Settlement.  If the value of the

Property condemned is less than $50,000, and the condemnation does not affect the density,

parking availability, set-backs, or site location of Purchaser's proposed developments, Purchaser

shall be deemed to select alternative (ii) above.  If Purchaser elects to terminate this Agreement

under this Section, and the parties hereto shall have no further obligations or liabilities to one

another hereunder.

8.    Default.  The parties agree that, in the event of a default by Purchaser, Seller may

avail itself of all remedies at law and in equity, without limitation, and including the right to seek

specific performance.  If Seller defaults under this Agreement, Purchaser may pursue its rights

and remedies at law or in equity, including specific performance.  If any dispute between the

parties arises under or respecting this Agreement and is resolved by court proceedings,

arbitration proceedings (if mutually agreed to) or by settlement in lieu thereof and/or if either

party must seek to enforce its rights under this Agreement, the party substantially prevailing in

any such proceeding, settlement or enforcement action shall be entitled to recover from the other

party, and be authorized to obtain an award and/or judgment in any such proceeding or action for

its reasonable attorneys' fees and costs incurred in connection therewith.

Exhibit A

9.    Agents and Brokers.  Each party hereunder represents and warrants that it did not consult or deal with any broker or agent, real estate or otherwise, with regard to this Agreement or the transactions contemplated hereby, and each party hereto agrees to indemnify and hold harmless the other party from all liability, expense, loss, cost or damage, including reasonable attorneys' fees, that may arise by reason of any claim, demand or suit of any agent or broker arising out of facts constituting a breach of the foregoing representations and warranties.

10.    Binding Agreement.  This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

11.    Notices.  Any notice, request or demand required or permitted to be given pursuant to this Agreement shall be in writing and shall be deemed sufficiently given if delivered by hand by messenger at the address of the intended recipient, sent prepaid by Federal Express (or a comparable guaranteed overnight delivery service), or deposited in the United States first class mail (registered or certified, postage prepaid, with return receipt requested), addressed to the intended recipient at the intended recipient's address set forth below or at such other address as the intended recipient may have specified by written notice to the sender given in accordance with the requirements of this Paragraph.  Any such notice, request or demand so given shall be deemed given on the day it is delivered by messenger at the specified address, or on the day of deposit in the United States Mail, as the case may be.

15

Exhibit A

<table>
<tr><td>For the Seller:</td><td>c/o Mr. Thomas D. Eilerson<br>EDC<br>1660 Huguenot Road<br>Richmond, Virginia 23113</td></tr>
<tr><td>with a copy to:</td><td>Michael H. Terry, Esquire<br>Hirschler Fleischer<br>Federal Reserve Bank Building<br>701 E. Byrd Street, Floor 16<br>Richmond, VA 23219</td></tr>
<tr><td>For the Purchaser:</td><td>1201 Central Park Boulevard<br>Fredericksburg, Virginia 22401<br>Attn: B. Judson Honaker, Jr.</td></tr>
<tr><td>with a copy to:</td><td>John W. Steele, Esquire<br>Hirschler Fleischer<br>Federal Reserve Bank Building<br>701 E. Byrd Street, Floor 16<br>Richmond, VA 23219</td></tr>
</table>

12.    <u>Applicable Law</u>.  This Agreement shall be construed, performed and enforced in accordance with the laws of the Commonwealth of Virginia.

13.    <u>Interpretation</u>.  When the context in which words are used in this Agreement indicates that such is the intent, words in the singular number shall include the plural, and vice versa, and words in the masculine gender shall include the feminine and neuter genders, and vice versa.

14.    <u>Title and Headings; References</u>.  Titles and headings to Paragraphs and Subparagraphs herein are inserted for the convenience or reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.  All Paragraph and

16

Subparagraph references in this Agreement are to the Paragraphs or Subparagraphs of this

Agreement unless expressly stated to the contrary.

15.     Entire Agreement; Modification.  This Agreement contains the entire agreement

between the parties hereto relating to the Property and supersedes all prior and contemporaneous

negotiations, understandings and agreements, written or oral, between the parties hereto.  This

Agreement shall not be amended or modified and no waiver of any provision hereof shall be

effective unless set forth in a written instrument executed with the same formality as this

Agreement.

16.     Survival.  The provisions of Paragraph 2, Paragraph 3 relating to indemnity,

repair and delivery of materials and Paragraphs 8 , 9 and 22 of this Agreement shall survive

Settlement hereunder.

17.     Termination.  This Agreement shall be terminable at the option of Purchaser if not

accepted by Seller and two (2) fully executed copies thereof delivered to Purchaser on or before

5:00 p.m. on November 22, 2005.

23

18.     Time is of the Essence.  Time is of the essence of each and every provisions of

this Agreement.

Exhibit A

19.   <u>No Partnership:</u>  Seller and Purchaser are purchaser and seller only; Seller shall

have no equity interests in Purchaser or the profits derived by Purchaser.  Seller and Purchaser

expressly disclaim that they are partners or co-venturers in any respect.

20.   <u>Assignment.</u>  Except for an assignment by Purchaser to an Affiliate, Purchaser

shall not assign this Agreement without the prior written consent of Seller.

21.   <u>Attorney Fees:</u>  In any legal action or arbitration involving the subject matter of

this Agreement, the party substantially prevailing in such action shall be entitled to recover its

reasonable attorney's fees and court costs actually incurred in such action from the other party

and any award or order resulting from such action shall incorporate the award of such fees and

costs therein.

22.   <u>Tax Deferred Exchange.</u>  Seller may elect to include the sale of the Property in a

tax deferred or delayed exchange.  Purchaser shall cooperate with Seller in executing documents

necessary and appropriate to accomplish such exchange provided the same does not cause delay

in closing or expense to Purchaser.  Some or all of Seller's contract rights hereunder may be

assigned to enable Seller to effect its tax planning goals, provided no such assignment shall

relieve Seller of any obligation or duty hereunder or cause any liability or expense to Purchaser.

Purchaser agrees that Seller may substitute a qualified intermediary ("Intermediary") to act in

place of the Seller as the Seller of the Property.  Upon designation, the Intermediary shall be

18

Exhibit A

recognized by the Purchaser and the Purchaser shall accept performance by the Intermediary as
performance by the Seller.

23.    <u>Litigation.</u> Seller and Thomas D. Eilerson hereby agree, represent and warrant
that the payment from Purchaser at Closing of the portion of the Purchase Price payable at
Closing shall be sufficient consideration to satisfy and discharge, all of the claims of Seller and
its affiliates, Star Center Ventures, LLC and Thomas D. Eilerson and any other applicable parties
(the "Eilerson Parties") arising under or in connection with litigation previously filed by the
Eilerson Parties in the Circuit Court of the County of Stafford, Virginia (the "Litigation"), and/or
in connection with the subject matter thereof, adverse to James A. Moncure, George V. Moncure
and John E. Moncure (the "Moncure Parties"). Seller, Purchaser, the Eilerson Parties and the
Moncure Parties shall execute and deliver at Settlement mutual releases as to the matters which
were the subject of the Litigation in the form attached hereto as <u>Exhibit D</u>. Seller and Eilerson
shall execute and cause the Eilerson parties to execute the foregoing release.

24.    <u>Representations and Warranties of the Seller</u>. The Seller represents and warrants
as of the date hereof that to the best of its actual knowledge without investigation, except as
disclosed in the Seller's Materials :

(a)    <u>Authorization and Execution</u>. This Agreement has been duly authorized
by all necessary action on the part of the Seller and has been duly executed and delivered by the
Seller. Seller shall deliver to Purchaser, prior to Settlement, all organizational documents,

19

resolutions, certificates and other materials reasonably required by Purchaser to confirm the foregoing.

     (b)   <u>Operating Agreements</u>.  Except as disclosed in the Seller's Materials, the Property is not subject to any leases (other than the Leases), operating or maintenance agreements that cannot be terminated by Purchaser (as Seller's assignee), without charge or penalty, upon thirty (30) days' or less notice.

     (c)   <u>Pending Litigation</u>.  Except for the Litigation or as disclosed in the Seller's Materials, there is no litigation or any administrative proceeding pending with respect to the Property or for which Seller has received service of process or written notice of the threat thereof.

[Signatures to appear on following page]

Exhibit A

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed in its name pursuant to due authority as of the dates set forth below.

SELLER:

VIRGINIA CENTER VENTURES, LLC
a Virginia limited liability company

By: _____
Name: Thomas D. Eilerson
Title: Manager
Date: November 22, 2005

PURCHASER:

QUANTICO BUSINESS CENTER, LLC
a Virginia limited liability company

By: _____
Name: B. Judson Honaker, Jr.
Date: November 29, 2005

THOMAS D. EILERSON joins herein solely
to agree to the provisions of Paragraph 23

_____
Thomas D. Eilerson

21

Exhibit A

## **EXHIBIT A**

### **PROPERTY DESCRIPTION**

Exhibit A

## **EXHIBIT B**

## **ASSEMBLAGE DESCRIPTION**

Exhibit A

## EXHIBIT C

## TABLE OF CONTENTS OF SELLER'S MATERIALS

**Environmental:**

1. Certificate of Work Completion @ 4011 Jefferson Davis Highway, completed by J.L. Bishop Contracting, dated November 24, 2004;
2. Agreement between Edge Development Company and Battlefield Industrial Park regarding post-settlement environmental issues @ 4011 Jefferson Davis Highway;
3. Phase II Environmental Site Assessment for 4011 Jefferson Davis Highway, prepared by Zannino Engineering, dated July 21, 2003;
4. Phase I Environmental Site Assessment for Fritter Park parcel, prepared by Zannino Engineering, dated September 10, 2002;
5. Preliminary Geotechnical Investigation of Fritter Park parcel, prepared by Zannino Engineering, dated September 25, 2002

**Title/Survey:**

1. Recorded Deed of Easement for Gravity sewer, Water line and Force Main line between Virginia Center Ventures, LLC and County of Stafford, dated May 10, 2005, recorded in instrument LR050020987;
2. Title Commitment, Schedule A & B from Southern Title Insurance Corporation dated November 1, 2004;
3. Physical Improvements Survey for Tax Map Parcel 13-10, 4011 Jefferson Davis Highway, dated June 10, 2003, prepared by T.E.L.S, Ltd.
4. Plat of 84.436-acre site (Fritter Park) dated August 5, 2004.

**Tenant Information:**

A. All-American Awards
   i. Lease Extension Agreement dated December 2, 2004;
   ii. Letter Agreement dated March 12, 1999 between Hilldrup Properties, Inc. ("Landlord") and H. David Elms, Jr. ("Tenant");
   iii. Lease Agreement dated August 19, 1996 between Hilldrup Moving and Storage and H. David Elms, Jr.

B. The Sportsman Center
   iv. Letter Agreement dated August 21, 2003 between Hilldrup Properties and Max Barentine t/a The Sportsman Center;
   v. Letter Agreement dated March 6, 2003 between Hilldrup Properties and Max Barentine t/a The Sportsman Center.

Exhibit A

C. ____ AmeriGas Propane, L.P., formerly Columbia Propane
   vi. Letter from Virginia Center Ventures, LLC dated October 6, 2005 to
       Ms. Tara Moyer regarding tenancy of premises;
   vii. Agreement to Terminate Lease dated October 26, 2004 between Edge
        Development Company, LLC and AmeriGas Propane, LP
   viii. Real Property Lease dated September 14, 2000 between Hilldrup
         Properties and Columbia Propane Corporation.

D. Utility bills –
   ix. Virginia Power, acct # 2337944934
   x. County of Stafford/water & sewer, acct # 000094283-000025884

**Appraisals:**

1. Appraisal of 4011 Jefferson Davis Highway, prepared by Joseph J. Blake &
   Associates, dated October 6, 2004;
2. Appraisal of former Fritter Park parcel, prepared by Joseph J. Blake & Associates,
   dated August 10, 2004.

**Engineering Plans**

1. Stafford Gateway Research & Development Park, *Conceptual Entrance Plan*,
   dated September 26, 2002, Sheet 1 of 1, prepared by VHB, Inc.

2. Stafford Gateway Research & Development Park, *Schematic Road Study, (Option
   1)*, dated July 21, 2003, Sheet 1 of 1, prepared by VHB, Inc.
3. Stafford Gateway, *Existing Conditions Plan*, Sheets 1 – 10, dated September 23,
   2002, prepared by VHB, Inc.
4. Stafford Gateway, *Zoning Exhibit*, Sheets 1-2, dated February 20, 2004, prepared
   by VHB, Inc.
5. Hilldrups Sewage Pump Station and Force Main, *Gravity Sewer Plan and Profile*,
   dated November 12, 2004, Job No. 741733, prepared by PARSONS.
6. Stafford Gateway, *Raising the Bar*, Conceptual Master Plan and Building
   rendering (used for marketing purposes).

**Miscellaneous Studies:**

1. Traffic Impact Study on Russell Road, dated August 23, 2002, prepared by VHB,
   Inc.
2. Traffic Impact Assessment, Stafford Gateway Research & Development Park,
   dated June 6, 2002, prepared by VHB, Inc.
3. Application for Conditional Zone Reclassification, Impact Statements, dated June
   7, 2002, prepared by VHB, Inc.
4. Environmental Assessment and Request of Finding of No Significant Impact for

Exhibit A

properties known as "Fritter Park" and "Bloomington", dated November 8, 2002,
prepared by Zannino Engineering

5.      : Phase I Cultural Resources Survey of the 85-acre Fritter Park Tract and 180-acre
Moncure Tract in Stafford County, Virginia, dated August 2003, prepared by
Cultural Resources, Inc.

## EXHIBIT D

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release (hereinafter referred to as the "Settlement Agreement") is made this _____ day of December, 2005, by and between James A. Moncure, George V. Moncure, John E. Moncure, Moncure Brothers LLC, a Virginia limited liability company (hereinafter referred to as "The Moncures") parties of the first part; Thomas D. Eilerson, Star Center Ventures, LLC, a Virginia limited liability company; Edge Development Company, LLC, a Virginia limited liability company (hereinafter referred to as "Eilerson") parties of the second party; all collectively referred to as "The Parties".

### Recitals

Whereas, Eilerson is a real estate investor, and developer and builder; and

Whereas, the Moncures are the landowners of real estate in Stafford County, Virginia described on Exhibit "A" and hereinafter referred to as "the Property"; and

Whereas, the Parties engaged in negotiations, prepared agreements between themselves, both written and oral, entered into negotiations with the Board of Supervisors of Stafford County ("the Board") and others, relating to the exchange of properties between the Board and the Moncures of real estate previously owned respectively by the Moncures and the Board, as well as rezoning applications, proffers, proposed financial agreements and formed entities to acquire and develop property in Stafford County, Virginia, and Whereas, the parties became involved in a dispute as to their rights and duties relating to their legal relationship including, but not limited to, a Memorandum of Understanding dated March 19, 2002 that was the subject of a suit filed in the Circuit Court of Stafford County, Virginia as Chancery No. CH04-413 that

Exhibit A

was subsequently dismissed by the Court, and was further pursued by a Petition for Appeal that was denied by the Supreme Court of Virginia; and

Whereas, Eilerson continues to claim an interest in the Property known as "Fritter Park", which the Moncures acquired through an exchange with the County effectuated by deeds dated August 31, 2004; and

Whereas, Eilerson purchased another property near the Property of Moncures from Battlefield Industrial Park, LLC containing 92,022 square feet as shown on Exhibit "B" placing it in the name of Virginia Center Ventures, LLC of which it is the Manager and controlling person; and

Whereas, both parties have monetary claims against each other for funds expended relating to this pursuit of acquiring the property, its zoning and fees for experts, a letter of credit for $500,000 etc. and claims to interests in real estate, joint ventures and limited liability companies; and

Whereas, Eilerson has contracted to sell the property on Exhibit "B" to Quantico Business Center, LLC ("Quantico"), (of which Moncure is a member), pursuant to the Purchase Agreement, dated November __, 2005, between Virginia Center Ventures, LLC and Quantico (the "Purchase Agreement"); and

Whereas, the parties desire to resolve by this Settlement Agreement all of their claims and causes of action against each other.

NOW THEREFORE, in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

2

Exhibit A

1.    The foregoing Recitals are made an integral part of this Agreement.

2.    All parties agree to execute such normal documents necessary to comply with their obligations under this Agreement.

3.    Except for their rights under this Agreement, the Moncures for and on behalf of themselves, the Moncure Brothers LLC, their agents, successors, representatives, affiliates, heirs, estate and assigns, do hereby completely release and forever discharge Eilerson, Star Center Ventures, LLC, Edge Development Company LLC, and their agents, successors, representatives, affiliates, heirs, estate, and assign from any and all claims, rights, demands, actions, liabilities, obligation, injuries, judgments, and causes of action of any and all kinds, nature and character whatsoever, known or unknown, vested or contingent, latent or patent, from any date prior to the date of this Agreement, whether based on a tort, including, but not limited to, a negligent or intentional tort, contract, (implied, oral or written) or any other theory of recovery or relief under federal or state law and whether for compensatory damages, punitive damages or equitable relief.

4.    Except for their rights under this Agreement, the Purchase Agreement and the "Note" and "Guaranty" as defined in and contemplated by the Purchase Agreement, Eilerson, Star Center Ventures, LLC, Edge Development Company LLC, and their members, agents, successors, representatives, affiliates, heirs, estate and assigns do hereby completely release and forever discharge the Moncures, their successors, representatives, affiliates, heirs, estate and assigns from any and all claims, rights, demands, actions, liabilities, obligations, injuries, judgments, and causes of action of any and all kinds, nature and character whatsoever, known or unknown, vested or contingent, latent or patent, from any date prior to the date of this Agreement, whether based on a

3

tort, including, but not limited to, a negligent or intentional tort, contract (implied, oral or written) or any other theory of recovery or relief under federal or state law and whether for compensatory damages, punitive damages or equitable relief.

5.    It is understood and agreed by the parties that this is a compromise settlement of disputed claims, and that the furnishing of the consideration as settlement and release of all claims shall not be deemed or construed as an admission of liability or responsibility at any time for any purpose.

6.    It is further understood and agreed by the parties that in the event that any term of this Agreement shall be declared invalid, illegal or unenforceable, that provision shall be severed from the balance of the Agreement and the remaining provisions shall remain in full force and effect and shall not in any way be affected or impaired. Upon determination that any such term is invalid, illegal or unforeseeable, that term shall be read so as to effect the original intent of the parties as nearly as possible.

7.    It is further agreed that this Agreement shall be governed by the laws of the Commonwealth of Virginia.

8.    If any action is brought to enforce this Agreement or as a consequence of a breach of this Agreement, the prevailing party shall be entitled to recover its actual attorneys' fees and costs.

9.    This Agreement incorporates the entire understanding between the parties, and the parties acknowledge that there are no agreements, promises, undertakings or understandings other than those set forth herein. The parties further acknowledge that in reaching or entering into this Agreement, they have not relied upon any representation, statement, understanding or promise except those set forth herein.

10.    This Agreement may be executed in one or more counterparts, each of which will be

4

Exhibit A

deemed to be an original copy and all of which, when taken together, will be deemed to

constitute one and the same agreement.

**[Signatures to appear on following page.]**

Exhibit A

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the dates hereinafter written:

_____         _____
Date                                    James A. Moncure

_____         _____
Date                                    George V. Moncure

_____         _____
Date                                    John E. Moncure

                                        MONCURE BROTHERS LLC

_____         By:_____
Date                                        James A. Moncure, its Manager

                                        STAR CENTER VENTURES, LLC
                                        a Virginia limited liability company

_____         By:_____
Date                                        Its Manager

                                        EDGE DEVELOPMENT COMPANY, LLC, a
                                        Virginia limited liability company

_____         By:_____
Date                                        Thomas D. Eilerson, its Manager

_____         _____
Date                                    Thomas D. Eilerson

#705579 v9   018622.03377

6

Exhibit

# Quantico Corporate Center
## *at Stafford*

| 0 | 100 | 200 | North |

## Space Summary

| Building A | Four Story Office | 125,000 Square Feet |
|---|---|---|
| Building B | Four Story Office | 125,000 Square Feet |
| Building C | Four Story Office | 125,000 Square Feet |
| Building D | Four Story Office | 125,000 Square Feet |
| Building E | Four Story Office | 100,000 Square Feet |
| Building F | Four Story Office | 100,000 Square Feet |
| | One Story Manufacturing | 50,000 Square Feet |
| Building G | Four Story Office | 75,000 Square Feet |
| Building H | Four Story Office | 75,000 Square Feet |
| Building I | Four Story Office | 75,000 Square Feet |
| Building J | Four Story Office | 75,000 Square Feet |

**Total Building Area**            1,050,000 Sq. Ft.

**Total Parking**                      3,612 Spaces

| Building 1 | One Story Retail | 22,500 Square Feet |
|---|---|---|
| Parking | | 137 Spaces |

Exhibit A

## DEVELOPMENT MANAGEMENT AGREEMENT

This Development Management Agreement is made and entered into as of the date set forth on the signature page hereof by and between Quantico Business Center, LLC, a Virginia limited liability company ("Owner") and Silver-Honaker Development Company, LLC, a Virginia limited liability company ("Developer").

**Recitals:**

A.    Owner owns the real estate described in Exhibit A attached hereto (the "Property") for passive investment purposes.

B.    Developer has vast experience in the planning, development, construction, financing, sale, leasing and operation of commercial real estate projects and desires to provide such services to Owner according to the terms and conditions contained herein.

C.    Developer desires to develop and construct office buildings on the Property (the "Project").

D.    Owner is willing to engage Developer to develop the Project, provided that Developer is responsible for all aspects of the development and construction of office buildings on the Property.

**Agreement:**

NOW THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged by all parties, the parties hereby agree as follows:

1.    <u>Engagement; Authority of the Developer</u>.  Subject to the terms and conditions of this Agreement, Owner engages Developer to provide the services ("Services") described in this Agreement in exchange for the Development Fee described in Section 3.  Except as provided in Section 2, Developer shall have full charge of all aspects of the planning, construction and development of the Project and is hereby authorized to make all decisions and take all action on Owner's behalf as Developer considers necessary and appropriate to develop the Property in accordance with the overall plan of development ("Development Plan") approved by Owner and Developer.  Developer shall have the following duties:

1.1    <u>Feasibility Study and Development Plan</u>.  Developer shall conduct an internally prepared financial analysis and feasibility study of the Project and, based upon such analysis, prepare the Development Plan and Budget ("Budget") for the Project.

1.2    <u>Permits and Approvals</u>.  Developer shall obtain (or cause to be obtained) all governmental permits and approvals as required by applicable law.

Exhibit A

       1.3    <u>Consultants and Contractors</u>. Developer shall, in its sole and exclusive discretion, select and retain (a) a Project Architect to prepare the plans and specifications for the Project ("Project Plans"), (b) a civil engineer to provide such civil engineering services as the Project Architect and Developer may require for the design of the Project, (c) a general contractor for the Project and (d) any additional consultants, contractors, subcontractors, vendors, suppliers or other professionals as may be necessary to plan or construct the Project or obtain any required permits or governmental approvals. Developer will execute and be the contracting party with respect to any written contracts for such services and will oversee and coordinate the performance of such services.

       1.4    <u>Construction Loan</u>. Developer shall obtain construction financing for the Project from a lender authorized to do business in Virginia on terms reasonably satisfactory to Owner in an amount equal to the anticipated cost of the Project (the "Construction Loan"). Subject to Owner's approval of the terms of any Construction Loan as provided in Section 2, Owner agrees that Developer may encumber the Property with a deed of trust or mortgage to secure repayment of the Construction Loan. Developer shall be entitled to submit draw requests to the lender from time to time without the approval of Owner.

       1.5    <u>Invoices</u>. Developer shall be entitled to pay all costs, bills and invoices associated with the Project from draws against the Construction Loan. Developer shall provide Owner with copies of each draw request and an updated Budget with each draw request. If the Construction Loan is insufficient to pay the costs of the Project, Owner shall be responsible for funding any such shortfall.

       1.6    <u>Insurance</u>. Developer shall obtain builder's risk insurance and make Owner a named insured.

       1.7    <u>Tenant Work</u>. If all or any portion of the Project will be leased to tenants following completion, Developer shall manage and supervise the design and construction of all interior tenant space in accordance with the leases ("Tenant Work").

       1.8    <u>Sales</u>. It is the intent of the parties that the Owner will construct, lease and sell office buildings and other commercial improvements on the Property and that Developer shall be responsible for all sales activities at the Project. Developer may cooperate with and market the Project to licensed real estate brokers to secure purchasers for the Project. Developer may negotiate, authorize, approve and execute contracts and agreements for the sale of all or any portion of the Property on behalf of Owner. Owner and Developer may consider selling land prior to the construction of improvements upon such land, provided that any sale of unimproved land shall be subject to the written approval of Owner.

       1.9    <u>Leasing</u>. Developer shall be responsible for all leasing activities at the Project. Developer may cooperate with and market the Project to licensed real estate brokers to secure tenants for the Project. Developer may negotiate, authorize, execute and approve leases for all or any portion of the Project on behalf of Owner.

Exhibit A

1.10    Subcontracting. Developer shall be entitled to subcontract any of its duties hereunder to qualified subcontractors or consultants.

1.11    Execution of Documents and Instruments. In furtherance of its duties and authority described above, Developer may sign and deliver any document or instrument on behalf of Owner, including, without limitation: (a) documents, instruments and deeds evidencing the transfer of any real or personal property or interest therein or the creation of a lien thereon, and (b) documents, instruments, deeds and notes evidencing a loan or other borrowing or creating a mortgage or security interest in the Property.

2.    Approval of Owner. Owner shall be entitled to approve (a) the Development Plan, (b) the Budget, (c) the terms of the Construction Loan and (d) the sale of unimproved land as set forth in Section 1.8. Owner shall also be entitled to approve any material modification or material amendment to such items. Owner shall not unreasonably withhold or delay any such approval. Except as provided in this Section 2, Owner shall not be entitled to participate or approve any matters with respect to the development or sale of the Project and Developer shall have full power and authority to make all decisions and take all actions on behalf of Owner with respect to the development of the Project.

3.    Fees and Reimbursement.

3.1    Development Fee. Owner shall pay a development fee ("Development Fee") to Developer in the amount of ten percent (10%) of Owner's Net Profit from the Project. Net Profit shall mean all amounts received by Owner from Project sales or leasing activities less (a) all required debt service curtailments, (b) any reasonable expenses incurred by Owner that are related to the Project and were not paid pursuant to draws on the Construction Loan, (c) all closing costs and fees payable by Owner at closing, (d) all broker commissions paid at closing or upon the execution of any lease, (e) any amounts payable by Owner under the Purchase Agreement between Owner and Virginia Center Ventures, LLC and (f) any reserves required for future costs as determined by Developer. The Development Fee shall be payable from time to time upon the closing of a sale of all or any portion of the Project and/or as and when Net Profit is realized by Owner.

3.2    Employee Reimbursements. During the term of this Agreement, Owner shall reimburse Developer the then current incentive payments Developer's affiliates are required to pay to their employees resulting from such employees assisting in the sale or lease of all or any portion of the Project. In no event shall the reimbursement exceed the then current prevailing fees in the market payable to third parties for comparable services. The reimbursement shall be paid at the time of closing on the sale transaction or upon the execution of a lease.

4.    Term. The term of this Agreement ("Term") shall begin on the date set forth on the signature page attached hereto and shall extend until the final completion of and sale of the entire Project.

3

Exhibit A

5.    Termination.  This Agreement may be terminated prior to the end of the Term as follows:

5.1    Termination by Either Party.  Either party may terminate this Agreement upon written notice to the other at any time prior to Owner's approval of the Development Plan, Budget and Construction Loan.

5.2    Termination by Owner.  Owner may terminate this Agreement upon written notice to Developer if any of the following shall occur (a "Default"):

(a)    Developer, in connection with the performance of its duties hereunder, is guilty of fraud, dishonesty or intentional misconduct or fails to perform its duties hereunder in good faith, reasonably and in accord with the standards of the industry.  Owner acknowledges and agrees that the ultimate completion and financial success of the development of the Project will be the product of many factors, including the location of the Property, the prevailing market conditions and the actions of third parties, including architects, other consultants, contractors, lenders, purchasers, tenants and the like;

(b)    Developer commits a material breach of this Agreement and Developer has not made good faith efforts to cure such breach within ten (10) days from written notification of the breach, or that in fact remains uncured in any event for a period of sixty (60) days from written notification of the breach.  If such breach is not capable of being cured within such sixty (60) day period, despite Developer's diligent and continuous efforts, then such breach shall be deemed to have been cured if Developer proceeds diligently and continuously to prosecute such cure to completion within a reasonable time;

(c)    Developer is in default under any financing secured by the Property; or

(d)    Developer becomes insolvent; files a petition for relief under any federal or state bankruptcy or reorganization law; fails to dismiss an involuntary petition for relief under any federal or state bankruptcy or reorganization law within 90 days of filing; or ceases to do business.

5.3    Termination by Developer.  Developer may terminate this Agreement upon written notice to Owner if:

(a)    Owner commits a material breach of this Agreement and Owner has not made good faith efforts to cure such breach within ten (10) days from written notification of the breach, or that in fact remains uncured in any event for a period of sixty (60) days from written notification of the breach.  If such breach is not capable of being cured within such sixty (60) day period, despite Owner's diligent and continuous efforts, then such breach shall be deemed to have been cured if Owner proceeds diligently and continuously to prosecute such cure to completion within a reasonable time; or

(b)    Owner becomes insolvent; files a petition for relief under any federal or state bankruptcy or reorganization law; fails to dismiss an involuntary petition for relief under any federal or state bankruptcy or reorganization law within 90 days of filing; or ceases to do business.

5.4    Effect of Termination. Upon the termination of this Agreement pursuant to Section 5.1 or 5.2, no fee shall be payable to Developer. Upon the termination of this Agreement pursuant to Section 5.3, Owner shall pay Developer all fees described in Section 3, regardless of when Net Profit is realized by Owner. In addition, upon any termination of this Agreement pursuant to Section 5.2 or 5.3, the parties shall be entitled to any other remedies available at law or in equity as a result of the breach of this Agreement by the other party.

6.    Owner's Duties. Owner, without further consideration, shall promptly take such actions and shall promptly execute and deliver such deeds, instruments and other documents (including, without limitation, temporary and permanent grants of easements and rights of way for the construction, maintenance, use and operation of utilities and roads) as may be reasonably requested by Developer (or by its employees, agents, affiliates or representatives) to accomplish the development of the Project in accordance with the Development Plan, the Project Plans and the Budget.

7.    Access Rights. Developer and its duly authorized agents and employees shall be entitled to access to the Property for the purpose of carrying out its rights, duties and responsibilities under this Agreement.

8.    Reports; Project Documents. During the term of this Agreement, Developer shall provide Owner with written reports on a quarterly basis summarizing Developer's activities and the progress of the Project. Developer shall make available to Owner upon request copies of all Development Plans, Project Plans, Budgets, environmental reports, wetlands delineation plans, wetlands disturbance permits, topographic studies, soils studies, utilities studies and plans, discharge permits, and water and sewer agreements to the extent in Developer's possession or control.

9.    Independent Contractor. The parties acknowledge and agree that Developer is an independent contractor to Owner and nothing in this Agreement shall be construed to constitute the parties as agents, partners or joint venturers. The manner in which services are rendered hereunder by Developer, its employees, agents, affiliates, representatives and independent contractors shall be within Developer's sole control and discretion subject to the provisions of this Agreement. Developer shall be solely responsible for hiring, paying, and directing the work of and supervising Developer's employees which may be engaged in the performance of Developer's services hereunder. Developer shall be responsible for executing and filing when due, and making all payments required in connection with, all necessary employment related reports, forms, payroll and other tax returns which are required by law or regulation pertaining to the employment of Developer's personnel.

10.    Competition. Owner acknowledges and understands that Developer and its officers, directors, shareholders, members and affiliates have, are and will be, from time to time, actively engaged in the investment, development, construction and/or operation of projects

5

within and outside the region where the Property is located, for their own account and on a contract basis for others, and Owner agrees that Developer may and shall continue with such activities, and none of such activities by the Developer or its officers, directors, shareholders, members and affiliates shall (a) constitute a breach or violation of this Agreement, nor (b) give rise to a claim of conflict of interest, divided loyalty or the like.

11.    Indemnification.

11.1    Developer agrees to indemnify and hold Owner and its directors, officers, employees, affiliates, agents and representatives harmless from and against any and all damage, loss, claims, legal proceedings, demands, settlements, liability, costs and expenses, including without limitation, reasonable attorney's fees, arising out of or in connection with Developer's gross negligence or willful misconduct in connection with its performance under this Agreement and not covered and paid by applicable insurance.  Notwithstanding the foregoing, Owner understands and agrees that Developer shall not be liable for the design or construction of the Project, which shall be implemented by independent contractors.

11.2    Owner agrees to indemnify and hold Developer and its directors, officers, employees, affiliates, agents and representatives harmless from and against any and all damage, loss, claims, legal proceedings, demands, settlements, liability, costs and expenses, including without limitation, reasonable attorney's fees, arising out of or in connection with the Project (other than those arising out of or in connection with Developer's gross negligence or willful misconduct in connection with its performance under this Agreement) and not covered and paid by applicable insurance.

11.3    The obligations set forth in this Section 12 shall survive expiration or any termination of this Agreement.

12.    Limitation of Liability.  IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS) ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT AND UNDER ANY THEORY OF LIABILITY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

13.    Unavoidable Delays.  Each party hereto shall be excused from performing any obligation or undertaking provided for herein, other than for the payment of money or the granting of easements or dedication of rights of way, for such period as such performance is prevented, delayed or hindered by fire, earthquake, flood, explosion, adverse weather conditions, riot and insurrection, terrorism, mob violence, sabotage, inability to procure (or general shortage of) labor, equipment, facilities, materials or supplies in the open market, failure of transportation, strike, lockout, action of any labor union, laws or orders of governmental authorities or any other cause not in the reasonable control of the party prevented, delayed or hindered thereby, which events or conditions are generally referred to as "force majeure" conditions or occurrences,

6

including reasonable delays for adjustment of insurance proceeds in the event of an insured casualty.

14.    Underline{General}.

14.1    Underline{Assignment}. Neither party shall assign this Agreement, in whole or part, without the prior written consent of the other party except that either party may assign this Agreement in its entirety to its parent company, any subsidiary in which it holds a majority voting interest, or to its successor in connection with a merger, reorganization, sale of a majority or controlling interest in such party's voting stock or sale or transfer of all or substantially all of the business assets, or part of the business, to which this Agreement relates. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. The making of an assignment permitted hereunder shall not relieve the party making such assignment from any of its obligations hereunder.

14.2    Underline{Notices}. Except as otherwise provided in this Agreement, notices required to be given pursuant to this Agreement shall be given in writing and shall be effective (a) upon hand delivery, (b) one business day following deposit with a nationally recognized overnight delivery service, charges prepaid, or (c) three days following deposit with the United States Postal Service, certified mail, postage prepaid, to the parties at the addresses set forth on the signature page hereof or such other addresses as the parties may designate by proper notice.

14.3    Underline{Waiver}. Failure by either party to insist upon the strict compliance with any of the terms, covenants, provisions or conditions of this Agreement shall not constitute a waiver or relinquishment of such right or power at any other time or times.

14.4    Underline{Entire Agreement; Amendment}. This Agreement, constitutes the entire agreement between the parties hereto with regard to the subject matter hereof and supersede all prior oral and written discussions and understandings. This Agreement may be amended only by a written instrument signed by both parties.

14.5    Underline{Interpretation, Enforcement and Severability}. Each and every provision of this Agreement shall be interpreted and enforceable to the fullest extent allowed by applicable law. Should any term, provision, clause, covenant or condition herein be declared wholly or partially invalid or unenforceable by any court or be thereby amended, the remaining whole, partial or amended terms, provisions, clauses, covenants and conditions shall be fully enforceable at law or equity.

14.6    Underline{Governing Law; Venue; Waiver of Jury Trial}. This Agreement shall be governed by, subject to and construed in accordance with the laws of the Commonwealth of Virginia without regard to its conflict of law provisions. In all court proceedings arising out of or brought in connection with this Agreement, the parties hereto irrevocably consent to exclusive personal jurisdiction by, and venue in, the Courts of the County of Spotsylvania, Virginia and the United States District Court for the Eastern District of Virginia, Richmond Division. To the fullest extent permitted by law, the parties each knowingly, voluntarily and intentionally waive any rights they may have to a trial by jury with respect to any claim, suit, motion for judgment or legal proceeding arising out of, under, or in connection with this Agreement.

Exhibit A

     14.7   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which taken separately shall be deemed an original and all of which taken together shall constitute one and the same agreement.

[Signatures on Following Page]

Exhibit A

IN WITNESS WHEREOF, the parties have affixed their signatures on this _____ day of
_____, 20__.

SILVER-HONAKER DEVELOPMENT COMPANY, LLC

By:_____
Its:_____

Address for Notices:        1201 Central Park Blvd.
                            Fredericksburg, Virginia 22401
                            Attn: B. Judson Honaker, Jr.

With Copy To:               1001 East Telecom Drive
                            Boca Raton, Florida 33431
                            Attn: Jesse Holshouser


QUANTICO BUSINESS CENTER, LLC

By: SHS Quantico, LLC
Its: Manager

    By: _____
    Its: _____

Address for Notices:        SHS Quantico, LLC
                            1201 Central Park Blvd.
                            Fredericksburg, Virginia 22401
                            Attn: B. Judson Honaker, Jr.

With Copy To:               Moncure Brothers, LLC
                            179 Bells Hill Avenue
                            Stafford, Virginia 22554
                            Attn: James A. Moncure

With Copy To:               1001 East Telecom Drive
                            Boca Raton, Florida 33431
                            Attn: Jesse Holshouser

With Copy To:               159 Lichfield Boulevard, Suite 101
                            Fredericksburg, VA 22406
                            Attn: Samer E. Shalaby

9

Exhibit A

# EXHIBIT A

## Description of Property

Real property containing 84.436 acres, more or less, in Aquia Magisterial District (formally, Griffis-Widewater Magisterial District) of Stafford County, Virginia and commonly referred to as Fritter Park.

a.k.a TM #13-67, as more fully described in a Deed of Exchange dated August 31, 2004 and recorded as Instrument No. LR040033475 in the Clerk's Office of the Circuit Court of Stafford County, Virginia, by and between The Board of Supervisors of Stafford County, Virginia, as Grantor and George V. Moncure V, John Eric Moncure and James Ashby Moncure, as Grantees.

Exhibit B

## OPERATING AGREEMENT

## QBC PROPERTIES, LLC

In consideration of the mutual promises of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned, Moncure Brothers, LLC, a Virginia limited liability company, SHS Quantico, LLC, a Virginia limited liability company, and Dynasty Investors, LLC, a Delaware limited liability company, hereby enter into this Operating Agreement, effective as of the 7th day of May, 2015, for the governance of **QBC PROPERTIES, LLC**, a Virginia limited liability company, on the terms and conditions hereof.

## ARTICLE I
## DEFINED TERMS

The capitalized terms used in this Operating Agreement shall, unless the context otherwise requires, have the meanings specified in this Article I.

**Act.** The Virginia Limited Liability Company Act §§13.1-1000 et seq. of the Code of Virginia, 1950, as amended, and any successor to such Act.

**Additional Land.** Any parcel of real property located within 3,000 feet of (a) the Land, or (b) any other real property purchased or obtained by the Company at any time. Additional Land shall not include any land that is intended to be developed for residential purposes.

**Affiliate(s).** As applied to a Person, any other Person directly or indirectly controlling, controlled by, or under common control with that Person. Controlling, controlled by or under common control means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through ownership of voting securities or otherwise.

**Articles of Organization.** The Articles of Organization of the Company described in Article II of this Operating Agreement.

**Bankruptcy; Bankrupt.** Bankruptcy under the Federal Bankruptcy Code, an assignment for the benefit of creditors and/or an adjudication of insolvency under any state insolvency act or procedure or the occurrence of any other event of bankruptcy under the Act.

**Business Day.** Any day other than a Saturday, Sunday and those legal public holidays specified in 5 U.S.C. § 6103(a), as amended from time to time.

**Capital Account.** The Capital Account established and maintained for each Member pursuant to Section 6.5 of this Operating Agreement.

**Capital Contributions.** The total amount of cash and/or the agreed fair market value of property actually contributed by a Member to the capital of the Company less the amount of

Exhibit B

indebtedness, if any, of such Member which is assumed by the Company and/or the amount of indebtedness, if any, to which such property is subject, as of the date of contribution (without regard to the provisions of I.R.C. Section 7701(g)), as well as any additional contributions actually made pursuant to this Operating Agreement, including, but not limited to, any amounts paid by a Member (except to the extent indemnification is made by another Member) in respect of any claims against, or liabilities or obligations of, the Company and/or pursuant to any guaranty of Company indebtedness (subject, however, to the provisions of Section 6.4) or otherwise by such Member.

**Code.** The Internal Revenue Code of 1986, as it has been and may be amended, or any similar Federal internal revenue law enacted in substitution of the Internal Revenue Code of 1986, and the corresponding revenue law (and sections thereof) of any state or jurisdiction.

**Company.** QBC PROPERTIES, LLC, as such limited liability company may from time to time be constituted.

**Company Property or Properties.** All interests, properties and rights of any type owned by the Company, whether owned by the Company at the date of its formation or thereafter acquired.

**County.** Stafford County, Virginia.

**Developer.** The development company engaged by the Company to perform certain development services in exchange for certain fees.

**Development.** Development has begun with respect to the Land once initial infrastructure improvements on the Land have commenced.

**Development Agreement.** That certain undated Development Management Agreement by and between QBC, as owner, and Silver-Honaker Development Company, LLC, as developer.

**Dynasty.** Dynasty Investors, LLC, a Delaware limited liability company.

**Effective Date.** May 7, 2015.

**Interest.** All rights and interests of a Member under this Operating Agreement and the Act at any particular time, including, without limitation, (i) the right of a Member, expressed as a percentage on <u>Schedule A</u>, to receive distributions of revenues, allocations of income, loss and other tax incidents and distributions of liquidation proceeds and/or other sums under this Operating Agreement, (ii) all management rights, voting rights or rights to consent, and (iii) any and all other benefits to which a Member may be entitled as provided in this Operating Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of this Operating Agreement and the Act.

**Land.** Those certain parcels of land located in Stafford County, Virginia, as such parcels are more fully described on <u>Schedule B</u> hereto (except to the extent previously sold or otherwise disposed of by QBC), intended to be acquired by the Company pursuant to the Merger.

2

357389 3 4873 166

Exhibit B

**Manager.** Manager is defined in Section 10.1.

**Member(s).** At any time, the Person(s) who then own Interests in the Company. The Members are listed on Schedule A.

**Merger.** The contemplated merger by QBC with and into the Company, intended to be effectuated shortly after the date hereof.

**Moncure.** Moncure Brothers, LLC, a Virginia limited liability company.

**Net Cash Flow.** The total cash receipts of the Company (including, without limitation, loan proceeds, refinancing proceeds, gross sales proceeds and the cash Capital Contributions of the Members), *plus* any other funds (including amounts previously set aside as reserves by the Manager, where and to the extent the Manager no longer regards such reserves as reasonably necessary in the efficient conduct of the Company business) deemed available for distribution and designated as Net Cash Flow by the Manager, in its reasonable discretion, *less* the total cash disbursements of the Company such as, but not limited to, operating expenses of the Company, payments of principal and interest on any loans made to the Company by any Person whatsoever (including Members), and *less* such reserves or other uses of cash as the Manager, in its reasonable discretion, shall deem to be necessary for the efficient conduct of the Company business.

**Notification.** A writing containing any information required by this Operating Agreement to be communicated to any Person, which may be personally delivered, sent by Federal Express, DHL, or other reputable overnight delivery service, or sent by facsimile transmission (with a copy of such transmission sent on the same day by Federal Express, DHL, or other reputable overnight delivery service marked for next Business Day delivery) to such Person, at the last known address of such Person on the Company records. Any such Notification shall be deemed to be given (i) when delivered (or when delivery is refused), in the case of personal delivery, (ii) the next Business Day after the date on which it is properly deposited, marked for next Business Day delivery, with Federal Express, DHL, or other reputable overnight delivery service, in the case of overnight delivery, and (iii) when transmitted properly (being 9:00 a.m. to 5:00 p.m., local time for the recipient, on any Business Day) with confirmation of such transmission, in the case of facsimile transmission. Any communication containing information sent to any Person other than as required by the foregoing sentences, but which is actually received by such Person, shall constitute Notification as of the date of such receipt for all purposes of this Operating Agreement.

**Operating Agreement.** This Operating Agreement, including all exhibits and schedules attached hereto, as originally executed and as subsequently amended from time to time.

**Percentage Interest.** With respect to each Member, the percentage participation in the Company of such Member as set forth opposite the name of such Member under the column "Percentage Interest" in Schedule A attached hereto, as such percentage may be adjusted from time to time pursuant to the terms hereof.

3

Exhibit B

**Person.** Any natural person, limited liability company, general partnership, limited partnership, corporation, joint venture, trust, business trust, cooperative or association.

**Preferred Return.** A cumulative preferred return to Dynasty in the amount of eight percent (8%) per annum on any of its unreturned Capital Contributions.

**Prime Rate.** The "Prime Lending Rate" published and announced from time to time in the "Money Rates" section of *The Wall Street Journal* (or, if more than one rate is so published, the highest prime lending rate so published).

**Project.** The Land, together with all improvements thereon (including the anticipated business center to be developed and constructed on the Land and to be known as Quantico Corporate Center at Stafford, Virginia) and appurtenances thereto at any time existing during the term hereof.

**Property.** All real and personal property (including both tangible and intangible property) acquired by the Company, together with any improvements thereto.

**QBC.** Quantico Business Center, LLC, a Virginia limited liability company.

**SHS.** SHS Quantico, LLC, a Virginia limited liability company.

**Transfer.** Any change occurring in the legal or beneficial ownership of an Interest, whether made voluntarily or involuntarily by operation of law, including, but not limited to, the following:

    1.      except as expressly set forth below, a sale, assignment, pledge or gift to any Person, including specifically the transfer, in one or more related transactions, of a controlling ownership interest in a Member, including, without limitation, any such transfer that shall occur as a result of or in connection with a recapitalization, reorganization, merger, acquisition, takeover, or similar transaction;

    2.      a general assignment for the benefit of creditors, or any assignment to a creditor resulting from the creditor's foreclosure upon or execution against such Interest (or any part thereof);

    3.      the filing by the transferor Member of a voluntary Bankruptcy petition;

    4.      the adjudication of a Member as Bankrupt or insolvent;

    5.      the filing of a petition or answer by a Member seeking for such Member dissolution, winding up, reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or rule;

4

Exhibit B

6.     the filing of an answer or other pleading by a Member admitting or failing to contest the material allegations of a petition filed against such Member in a Bankruptcy, insolvency, reorganization or similar proceeding;

7.     the seeking, consenting to or acquiescing in the appointment of a trustee, receiver or liquidator of the Member or of all or any substantial part of its property and/or all or any part of such Member's Interest;

8.     if a Member is a general or limited partnership, the dissolution and commencement of winding up of the partnership;

9.     if a Member is a corporation, the filing of a certificate of dissolution or its equivalent for the corporation or revocation of its charter; or

10.    if a Member is another limited liability company, the filing of articles of dissolution or termination or their equivalent for the limited liability company.

Notwithstanding the provisions of subparagraph 1 above to the contrary, the parties agree that (i) any merger by any party with an Affiliate of such party; (ii) any transfer, sale or assignment of a party's ownership interest in a Member to an Affiliate of such party; or (iii) any sale or assignment of an Interest by such party to an Affiliate of such party shall not be deemed a Transfer hereunder; provided, however, that, solely for purposes of defining a permitted Transfer hereunder, in addition to the transferee Affiliate being an Affiliate of such party, either (i) more than thirty percent (30%) of all economic rights, benefits and interests of such transferee Affiliate must be legally and beneficially owned (directly or indirectly) by such party; or (ii) more than thirty percent (30%) of all economic rights, benefits and interests of the party must be legally and beneficially owned (directly or indirectly) by such transferee Affiliate; and provided, further, that, no such permitted Transfer shall release such party from any of its obligations and responsibilities under this Operating Agreement.

## ARTICLE II
## ORGANIZATION

Articles of Organization.  Articles of Organization for the Company were filed with the Virginia State Corporation Commission on May 7, 2015, pursuant to the Act.  This Operating Agreement is subject to, and governed by, the Act and the Articles of Organization.  The existence of the Company began upon the effective date of filing of the Articles of Organization. The Company shall exist in accordance with the duration specified in the Articles of Organization.

## ARTICLE III
## NAME; PLACE OF BUSINESS; REGISTERED OFFICE AND AGENT

3.1    Name.  The name of the Company is "QBC PROPERTIES, LLC".

3.2    Registered Agent; Registered Office; Principal Office in the United States.  The registered agent of the Company is Corporation Service Company or any other Person designed

5

357389.3 4873 166

Exhibit B

by the Manager.  The address of the registered office of the Company is 11 South 12th Street, P.O. Box 1463, Richmond, Virginia 23218 or any other address designated by the Manager.  The principal office of the Company in the United States is 1201 Central Park Boulevard, Fredericksburg, Virginia 22401 or any other address designated by the Manager.

## ARTICLE IV
## PURPOSE; ADDITIONAL LAND

4.1     Purpose.  The purpose of the Company shall be to acquire and hold the Land for investment purposes and, if and when necessary or appropriate, to sell or otherwise dispose of the Land for the production of profit, and further to engage in any and all other activities that may be incidental, proper, advisable or convenient to accomplish the foregoing, as determined by the Manager (including, without limitation, obtaining financing and refinancing therefor), and that is not prohibited by the laws of the jurisdiction in which the Company engages in such investment.

4.2     Additional Land.  Additional Land is defined in Article I hereof and shall not be confused with the portions of the Land.  In the event that Additional Land becomes available to the Company or to any party (or its Affiliate) to this Operating Agreement, such party (or Affiliate) shall endeavor to allow the Company the opportunity to purchase such Additional Land.  Upon the acquisition of such Additional Land, it shall become part of the Land governed by this Operating Agreement.  Once the Project is substantially completed (based on the initial development plans) or the Company no longer owns any Land, this Section 4.2 shall terminate and such restrictions shall no longer be applicable to any party.

## ARTICLE V
## MEMBERS

5.1     Members.  The names and addresses of the Members of the Company are as set forth on Schedule A of this Operating Agreement.

5.2     Admission of Additional Members.  Additional Members of the Company may be admitted as follows:

(a)     If the proposed additional Member desires to purchase an Interest from the Company, such purchase may be made and the admission of the additional Member shall become effective only if the identity of the proposed additional Member and the amount of the Capital Contribution to be made by such proposed additional Member in exchange for such proposed additional Member's Interest is first unanimously approved in writing by the existing Members, in their sole and absolute discretion.

(b)     If the proposed additional Member desires to acquire an Interest in a Transfer from an existing Member, such Transfer may be made and the admission of the additional Member shall become effective only in accordance with Article XI hereof.

6

357389 3 4873 166

Exhibit B

(c)    All other attempted Transfers of any Interest or right, or any part thereof (legally or beneficially), in or in respect of the Company shall be null and void.

## ARTICLE VI
## CAPITAL CONTRIBUTIONS AND INTERESTS

6.1    <u>Capital Contributions</u>.  Each Member has contributed as the Member's Capital Contribution, the cash and/or other property set forth on <u>Schedule A</u> attached hereto, which the Members agree has a fair market value as set forth on <u>Schedule A</u>.   No Member shall be obligated to make any additional Capital Contributions to the Company without the unanimous written consent of all Members.

6.2    <u>Interests</u>.  Each Member owns the Percentage Interest set forth opposite such Member's name on <u>Schedule A</u>.

6.3    <u>Covenants and Restrictions</u>.  Upon receipt of the Land pursuant to the Merger, the Company accepts all of the covenants, proffers and restrictions of record on the Land, including but not limited to, those of record in the County.

6.4    <u>Financing</u>.

(a)    The Manager may obtain market-rate institutional revolving development and construction financing on the Land.  It is the intent and desire of the Members that such loan(s) be in the amount of the acquisition cost of the Land plus all projected costs of the development of the Project (including, without limitation, all on-site and off-site improvements, but not including any work on Additional Land purchased by the Company pursuant to Article IV above).  Any acquisition loans and/or loans funding the development and construction of infrastructure (including, without limitation, roads, utilities, stormwater management and off-site improvements) benefiting the entire Land shall be secured by a deed of trust encumbering the entire Land and shall be non-recourse with respect to the Members.  Any development and construction loan(s) funding the construction of a building or buildings shall be secured by a first deed of trust encumbering only the portion of the Land on which the building or buildings are actively being constructed at any given time and shall be non-recourse with respect to the Members.  It is specifically agreed that neither Moncure nor any Affiliate of Moncure, shall be required to provide any guaranty of any such loan.  However, in the event (if agreed to by all Members) a Member (or its Affiliate) provides such a loan guaranty, there shall be no guaranty fee or other preferential payment to such person.  In addition, (a) the lender shall not be the lender under any Member's (or its Affiliates') corporate line of credit, and (b) the loan documents for any such loan shall not include provisions for cross-defaults to any other loans made to any Member or to any Affiliate of any Member.  The Manager shall finalize the terms and conditions of the development and construction loan(s) as well as choose the lender at the earliest date practical.

(b)    The Manager, on behalf of the Company, shall be entitled to borrow funds from any Member or any Affiliate of a Member to provide additional equity financing.  The interest rate on any such financing shall equal the Prime Rate plus one percent (1%).  Any

7

Exhibit B

acquisition loans and/or loans funding the development and construction of infrastructure (including, without limitation, roads, utilities, stormwater management and off-site improvements) benefiting the entire Land shall be secured by a deed of trust encumbering the entire Land and shall be non-recourse with respect to the Members. Any development and construction loan(s) funding the construction of a building or buildings shall be secured by a first deed of trust encumbering only the portion of the Land on which the building or buildings are actively being constructed at any given time and shall be non-recourse with respect to the Members. It is specifically agreed that neither Moncure nor any Affiliate of Moncure, shall be required to provide any guaranty of any such loan.

6.5   Capital Accounts. A Capital Account shall be established and maintained for each Member by the Company in the manner provided under, and in accordance with, Treasury Regulation §1.704-1(b)(2)(iv), as amended, and in accordance with the other provisions of Treasury Regulation §1.704-1(b) that must be complied with in order for the Capital Accounts of the Members to be determined and maintained in accordance with the provisions of Treasury Regulation §1.704-1(b)(2)(iv). In furtherance of and consistent with the foregoing, each Member's Capital Account (a) shall be increased by (i) the amount of money contributed by such Member to the Company, (ii) the fair market value of property contributed by such Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to by Section 752 of the Code); provided, however, that the contribution of the Land to the Company shall be credited to the respective Member's Capital Accounts as set forth in Section 6.1, and (iii) allocations to such Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treas. Reg. §1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treas. Reg. §1.704-1(b)(4)(i), and (b) shall be decreased by (i) the amount of money distributed to such Member by the Company, (ii) the fair market value of property distributed to such Member by the Company (net of liabilities secured by the distributed property that such Member is considered to assume or take subject to by Section 752 of the Code), (iii) allocations to such Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treas. Reg. §1.704-1(b)(2)(iv)(g), but excluding items of loss and deduction described in Treas. Reg. §1.704-1(b)(4)(i) or §1.704-1(b)(4)(iii). The Members' Capital Accounts also shall be maintained and adjusted as permitted by the provisions of Treas. Reg. §1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treas. Reg. §§1.704-1(b)(2)(iv) and §1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treas. Reg. § 1.704-1(b)(2)(iv)(g). A Member with more than one Interest shall have a single Capital Account that reflects all of its Interests, regardless of the class of Interests owned by such Member and regardless of the time or manner in which those Interests were acquired. On the Transfer of all or part of an Interest, the Capital Account of the transferor that is attributable to the Transferred Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. §1.704-1(b)(2)(iv)(1).

6.6   Return of Capital Contributions. No Member shall have the right to withdraw, or receive any return of, its Capital Contribution.

8

Exhibit B

6.7     Interest.  No interest shall be paid by the Company on Capital Contributions or on balances in the Members' Capital Accounts.

## ARTICLE VII
## ALLOCATIONS AND DISTRIBUTIONS

7.1     Allocation of Income and Loss.

(a)     Except as may be required by Section 704(c) of the Code and Treas. Reg. §1.704-1(b)(2)(iv)(f)(4), the income, gains, losses, deductions and credits (or items thereof) of the Company shall be shared by the Members in accordance with the Members' Percentage Interests for tax purposes.

(b)     Reserved.

(c)     Minimum Gain Chargeback.  Except as otherwise provided in Treas. Reg. § 1.704-2(f) and notwithstanding any other provision of this Article VII, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treas. Reg. § 1.704-2(g).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Treas. Reg. §§ 1.704-2(f)(6) and 1.704-2(j)(2). This Section 7.1(c) is intended to comply with the minimum gain chargeback requirement in Treas. Reg. § 1.704-2(f) and shall be interpreted consistently therewith.

(d)     Member Minimum Gain Chargeback.  Except as otherwise provided in Treas. Reg. § 1.704-2(i)(4) and notwithstanding any other provision of this Article VII, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treas. Reg. § 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treas. Reg. § 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Treas. Reg. §§ 1.704-2(i)(4) and 1.704-2(j)(2). This Section 7.1(d) is intended to comply with the minimum gain chargeback requirement in Treas. Reg. § 1.704-2(i)(4) and shall be interpreted consistently therewith.

(e)     Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treas. Reg. § 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6), items of income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required

9

Exhibit B

by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article VII have been tentatively made as if this Section were not applicable.

(f)     All items of income, gain, loss, deduction, and credit allocable to any Interest that may have been transferred shall be allocated between the transferor and the transferee based upon an interim closing of the books as of the date of the Transfer, provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Code and the regulations thereunder.

(g)     If, at any time during the Company's existence, any Member contributes to the Company property with an adjusted basis to the contributing Member which is more or less than the agreed fair market value and such property is accepted by the Company at the time of its contribution, the taxable income, gain, loss, deductions, and credits with respect to such contributed property for tax purposes only (but not for purposes of calculating the Members' respective Capital Accounts) shall be shared among the Members so as to take account of the variation between the basis of the property to the Company and its agreed fair market value at the time of contribution, pursuant to Section 704(c) of the Code using the traditional method.  Except as provided in this Section 7.1(g), all allocations shall be made in the same manner as prescribed in this Section 7.1.

7.2     Determination of Income and Loss.  At the end of each fiscal year of the Company, income, gain, loss, deduction and credit (or items thereof) shall be determined for the accounting period then ending and shall be allocated to the Members in accordance with this Article VII.

7.3     Cash Distributions.  Commencing no later than the end of the Company's first fiscal year, the Manager shall, at least semi-annually, distribute the Net Cash Flow to the Members, in the following order of priorities:

(a) First, to Dynasty, to the payment of its Preferred Return; then

(b) Second, to Dynasty, an amount equal to its Capital Contributions (to the extent not already distributed pursuant to this subsection (b)); then

(c) Third, the remainder of the Cash Flow shall be distributed to the Members, *pro rata*, in proportion with their respective Percentage Interests.

7.4     Distributions of Other Property.  From time to time, the Members also may cause Property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their respective Percentage Interests and may be made subject to existing liabilities and obligations.  Immediately prior to such distribution, the Capital Accounts of the Members shall be adjusted as provided in Treas. Reg. § 1.704-1(b)(2)(iv)(f).

10

Exhibit B

## ARTICLE VIII
## OWNERSHIP OF COMPANY PROPERTY

The Company Property shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Property or any portion thereof.  Title to any or all Company Property shall be held in the name of the Company and not in the name of any Member, any Affiliate or any nominee of either of the foregoing.  All Company Property shall be recorded as the property of the Company on its books and records.

## ARTICLE IX
## FISCAL MATTERS; BOOKS AND RECORDS

9.1     Bank Accounts; Investments.  Cash Capital Contributions, revenues and any other Company funds shall be deposited in a bank account or accounts established in the name of the Company, or shall be invested in furtherance of the purpose of the Company.  No other funds shall be deposited into Company bank accounts or commingled with Company investments. Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company's purpose, to pay Company debts or obligations or to be distributed to the Members pursuant to this Operating Agreement.  All checks shall require the signature of the Manager.

9.2     Records Required by Act, Right of Inspection.

(a)     Records Required.  During the term of the Company, the Manager shall maintain in the Company's principal office in the United States specified in Section 3.2 hereof all records required to be kept pursuant to the Act (the "Statutory Records").

(b)     Right of Inspection.  On written request at any time or from time to time, a Member may examine, inspect and/or copy in person, at any reasonable time, for any proper purpose, and at the Member's expense (other than Statutory Records, which, upon request, shall be provided to such Member at the sole cost of the Company), any Company records required to be maintained under the Act.

9.3     Books and Records of Account.  The Company shall maintain adequate books and records of account that shall be maintained on the accrual basis method of accounting and on a basis consistent with the appropriate provisions of the Code, containing, among other entries, a Capital Account for each Member.

9.4     Tax Returns and Information.  The Members intend for the Company to be treated as a partnership for tax purposes.  Each Member, by execution or acceptance of this Operating Agreement, covenants and agrees that it will file its own Federal and state income and other tax returns in a manner that is consistent with the tax classification of the Company as a partnership and will not take any action which is inconsistent with such classification.

11

Exhibit B

9.5    Fiscal Year.  The Company's fiscal year shall end on December 31 of each calendar year.

9.6    Tax Matters Partner.  SHS Quantico, LLC shall be the Company's "tax matters partner" pursuant to Section 6231(a)(7) of the Code.

### ARTICLE X
### MANAGEMENT OF THE COMPANY

10.1    Manager.  Except as otherwise expressly provided in this Operating Agreement, the business and affairs of the Company shall be vested in, managed and controlled by the Manager.  The Members designate SHS to manage the day-to-day affairs of the Company (the "Manager").  Except as otherwise provided in this Operating Agreement, SHS shall be able to bind the Company, as authorized in the Operating Agreement, without the knowledge and consent of the Members.

(a)    The Manager shall (i) conduct the business of the Company on a day-to-day basis, and will use commercially reasonable efforts to conduct the business of the Company, and (ii) perform the duties assigned to it under this Operating Agreement.  The Manager shall maintain the principal office of the Company in Virginia.

(b)    The Manager will use its commercially reasonable efforts to satisfy the administrative requirements of the Company in the same manner and using the same degree of care that it exercises in the performance of similar work for its own account.

(c)    All costs and expenses incurred by the Manager in carrying out its duties and responsibilities under this Operating Agreement shall be costs and expenses of the Company.

10.2    Action Without a Meeting.  Any action required or permitted to be taken at any meeting may be taken without a meeting, without prior notice and without a vote if a consent in writing, setting forth the action so taken, is signed on behalf of each Member; provided, however, that any solicitation for a written consent and any supporting information shall be sent to all Members in the same manner and at approximately the same time.

10.3    No Compensation.  The Manager shall not be entitled to compensation for acting as Manager.

10.4    Employment of Others.  The Manager shall be authorized to appoint, employ or contract with, at the expense of the Company, any Person (including the Affiliate(s) of the Members) which the Manager may deem necessary or desirable for the transaction of the business of the Company (including the Affiliate(s) of the Members).

10.5    Third Party Obligations.  All debts and liabilities to any third Persons incurred by the Manager with respect to the development, construction, administration and maintenance of the Project in accordance with this Operating Agreement shall be the debts and liabilities of the

12

Company only, and the Manager shall not be liable for any such obligations by reason of its management, supervision and direction of the various aspects of the Project for the Company in accordance with the terms of this Operating Agreement.

10.6    <u>Engagement and Termination of Developer</u>.  The Members acknowledge, ratify and affirm the Development Agreement.  The Manager shall be entitled to select and retain the Developer and approve the terms of any such engagement, subject to the approval of Moncure, which approval shall not be unreasonably withheld or delayed.  All compensation or fees payable to the Developer (other than expense reimbursements) shall be paid by SHS and shall not be an obligation of the Company.  If Developer is in default under the agreement between the Company and the Developer, Moncure shall have the right to require the Manager to terminate the Developer and replace the Developer with a new Developer selected by the Manager, provided that any such new Developer shall be subject to the approval of Moncure, which approval shall not be unreasonably withheld or delayed.  All compensation or fees payable to any such new Developer (other than expense reimbursements) shall be paid by SHS and shall not be an obligation of the Company, provided that such compensation and fees are consistent with the then current prevailing fees in the market payable to third party developers for comparable services.

## ARTICLE XI
## RIGHTS, POWERS AND OBLIGATIONS OF MEMBERS

11.1    <u>Authority, Liability to Third Parties</u>.  Except as otherwise expressly set forth in this Operating Agreement, no Member has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company.  No Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment, decree or order of a court, except that a Member shall remain liable to the other Members and/or the Company (but not to third parties) for such Member's fraud, willful misconduct, gross negligence or an intentional breach of any material provision of this Operating Agreement.

11.2    <u>Transfers of Interests</u>.  No Member shall cause there to be a Transfer of Interests in the Company such that the Member fails legally and beneficially to own, directly or indirectly, all of the ownership Interest held by such Member in the Company, without the prior consent of all Members, in each such other Member's sole and absolute discretion.    The parties acknowledge that the relationships of the Members to each other and the consent rights contained hereunder are personal in nature and, as a result, the Members have consented to the Transfer restrictions contained in this Operating Agreement, notwithstanding the fact the same may restrict a Member's right to alienate its Interest in the Company.

11.3    <u>Effect of Transfer of Interest</u>.  A Transfer of an Interest does not entitle the transferee to become, or to exercise rights or powers of a Member, without the consent of all Members in their sole and absolute discretion.  A Transfer only entitles the transferee to receive cash distributions and allocations of Company profits, losses and other tax incidents to the extent of the Interest Transferred.  Until the transferee is admitted as a Member pursuant to Section 11.4 below, (i) the transferor Member shall continue to be a Member and to be entitled to exercise any

rights or powers of a Member with respect to the Interest Transferred, and (ii) such transferor Member shall continue to be liable for all of its obligations, liabilities and responsibilities contained in this Operating Agreement.

11.4    Admission of Transferee as Member.    A transferee of a Member's Interest desiring to be admitted as a Member must execute a counterpart of, or an agreement adopting, this Operating Agreement. The admission of such transferee is subject to the unanimous approval of the Members. Upon admission of the transferee as a Member, the transferee shall have, to the extent of the Interest Transferred, the rights and powers and shall be subject to the restrictions and liabilities of a Member under this Operating Agreement, the Articles of Organization and the Act.    The transferee shall also be liable, to the extent of the Interest Transferred, for the unfulfilled obligations, if any, of the transferor Member to make Capital Contributions, but shall not be obligated for liabilities unknown to the transferee at the time such transferee was admitted as a Member and that could not be ascertained from this Operating Agreement.    Whether or not the transferee of an Interest becomes a Member, the transferor Member is not released from any liability to the Company under this Operating Agreement, the Articles of Organization or the Act.

11.5    No Encumbrance.    No Member may pledge or encumber its Interest in the Company as security for any financial obligation, whether or not related to the business of the Company, except as otherwise specifically provided above in Section 6.3 or for the purpose of settling potential litigation against Affiliates of Moncure related to the Land.

11.6    No Withdrawal.    No Member shall have any right to voluntarily resign or otherwise withdraw from the Company without the consent of all Members. In the event of any permitted withdrawal, on and as of the effective date of a Member's withdrawal from the Company under the provisions of this Operating Agreement, such former Member shall cease to have any Interest or any management or other rights, status or privileges of a Member, but such former Member shall not be released or discharged from any of the obligations of a Member under the provisions of this Operating Agreement, unless provided in the written consent of all Members.

11.7    Other Business.    Other than as provided in Section 4.2, the Manager and the Members may engage in or possess interests in other business ventures (unconnected with the Company) of every kind and description, independently or with others, including businesses competitive with that of the Company.  Neither the Company nor the other Members shall have any rights in or to such independent ventures or the income or profits therefrom.

11.8    Redemption of Dynasty.    Upon payment in full of all outstanding Preferred Return to Dynasty and return of one hundred percent (100%) of Dynasty's Capital Contributions, in each case pursuant to Section 7.3 (the "Redemption Conditions"), the Company shall have the right, but not the obligation, to redeem all of Dynasty's Interest in the Company for a redemption price equal to $1.00. Such redemption shall be effective upon the Company's satisfaction of the Redemption Conditions set forth in this Section 11.8, and delivery of written notice to Dynasty of such redemption, along with a bank check in the amount of the applicable redemption price. In the event the Company redeems Dynasty's Interest in the Company in accordance with the

14

Exhibit B

terms of this Section, Dynasty shall execute such redemption documents and provide such further assurances as the Company may reasonably request to evidence such redemption.

## ARTICLE XII
## DISSOLUTION AND WINDING UP

12.1    <u>Other Events Causing Dissolution</u>.    The Company shall be dissolved, the Company Property shall be disposed of, and its affairs wound up, in accordance with the Act.

12.2    <u>Deficit Capital Accounts</u>.  Notwithstanding anything to the contrary contained in this Operating Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Operating Agreement, upon dissolution of the Company, such deficit shall not be an asset of the Company, and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

## ARTICLE XIII
## INSURANCE, BONDS AND LETTERS OF CREDIT

13.1    <u>Indemnification</u>.    The Company shall indemnify, save harmless and pay all judgments arising against the Manager, the Members, and each Member's and Manager's respective shareholders, directors, employees, members and agents from any cost, expense, claim, liability or damage incurred by reason of such Person's relationship to the Company or any act performed or omitted to be performed by them in connection with this Operating Agreement or the business of the Company in accordance with the provisions of this Operating Agreement, including reasonable attorney's fees and costs incurred by them in connection with the defense of any action based on any such act or omission, which attorney's fees and costs may be paid as incurred, including all such liabilities under any Federal or state securities act (including the Securities Act of 1933, as amended) as permitted by law, except that the Company shall have no indemnification obligation hereunder with respect to any act or omission of any Person that constitutes fraud, willful misconduct or an intentional breach of any material provision of this Operating Agreement.  All judgments against the Company with respect to which any Person is entitled to indemnification may only be satisfied from the Company Property. Any Person entitled to be indemnified hereunder shall also be entitled to recover its reasonable attorney's fees and costs of enforcing this indemnity from the Company Property.

13.2    <u>Insurance</u>.    The Company may purchase and maintain insurance or other arrangements on behalf of any Person who is or was a Member, employee, agent or other Person identified above in Section 13.1 against any liability asserted against him or incurred by him in such a capacity or arising out of his status as such, whether or not the Company would have the power to indemnify him against that liability under this Article or otherwise.

Exhibit B

The Manager shall cause the Developer to name the Company as an additional named insured on its commercial general liability policy. The limits for such policy shall not be less than $10,000,000 covering the Company.

13.3    Limit on Liability of Members. The indemnification set forth in this Article shall in no event cause the Members to incur any personal liability beyond their total Capital Contributions, nor shall it result in any liability of the Members to any third party.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

14.1    Entire Agreement.    This Operating Agreement, including all exhibits and schedules attached hereto, contains the entire agreement between the Members relating to the subject matter hereof, and all prior agreements and operating agreements relative hereto which are not contained herein are terminated.

14.2    Law Governing. This Operating Agreement shall be governed by and construed in accordance with the local, internal laws of the Commonwealth of Virginia. In particular, this Operating Agreement is intended to comply with the requirements of the Act and the Articles of Organization.    In the event of a direct conflict between the provisions of this Operating Agreement and the mandatory provisions of the Act or any provision of the Articles of Organization, the Act and the Articles of Organization, in that order of priority, will control.

14.3    Successors and Assigns.    This Operating Agreement shall be binding upon and shall inure to the benefit of the Members and, subject to the restrictions upon Transfer of a Member's Interest set forth elsewhere in this Operating Agreement, their respective successors and assigns.

14.4    Severability.    This Operating Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations. If any provision of this Operating Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, but the extent of such invalidity or unenforceability does not destroy the basis of the bargain between the Members as expressed herein, the remainder of this Operating Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

14.5    Headings.    The Article and Section headings appearing in this Operating Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article or Section.

14.6    Construction.    Whenever required by the context, as used in this Operating Agreement, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter. Unless expressly stated herein, all references to Articles refer to articles of this Operating Agreement, and all references to Schedules are to schedules attached hereto, each of which is made a part hereof for all purposes.

16

Exhibit B

14.7    Offset.  Whenever the Company is to pay any sum to any Manager or Member, any amounts that such Person owes the Company may be deducted from that sum before payment.

14.8    Effect of Waiver or Consent.  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

14.9    Further Assurance.  In connection with this Operating Agreement and the transactions contemplated hereby, each party shall execute and deliver any additional documents and instruments, and perform any additional acts, that may be necessary or appropriate to effectuate and perform the provisions of this Operating Agreement and those transactions.

14.10   Waiver of Certain Rights.  Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the Property of the Company.

14.11   Counterparts and Binding Effect.  This Operating Agreement may be executed in counterparts, each of which shall be an original, but all of which taken together shall constitute a single document. This Operating Agreement shall be binding upon the Manager and each Member as evidenced by their signatures below.

14.12   Attorney's Fees.  If any party becomes involved in litigation or proceedings arising out of this Operating Agreement or the performance hereof, the court or tribunal in such litigation or proceeding, or in a separate suit, shall award attorney's fees to the prevailing party. Unless judgment goes by default, the attorney fee award shall not be computed in accordance with any court schedule, but shall be such as to fully reimburse all attorney's fees actually incurred in good faith, regardless of the size of the judgment, it being the intention of the parties to fully compensate for all the attorney's fees paid or incurred in good faith.

14.13   Amendment of Agreement.  This Operating Agreement may be amended only in writing, in whole or in part, at any time only by the execution thereof of the unanimous consent of the Manager and the Members, as the context shall require.  No provision of this Operating Agreement may be waived except by a writing signed by the party to be charged therewith. This Section may be amended only with the unanimous consent of the Manager and the Members.

14.14   Notifications.  Notifications, as defined above, given under this Operating Agreement shall be duly given to the appropriate addresses and telecopy numbers set forth below (or to such other addresses and telecopy numbers as a party may designate as to itself by Notification to the others):

17

357389.3 4873 166

Exhibit B

|  |  |
|--|--|
| If to Moncure:<br>(of Affiliates) | Moncure Brothers, LLC<br>c/o George V. Moncure, V, Manager<br>1200 Williams Street<br>Stafford, VA  22554<br>Telephone No.:  _____<br>Telecopy No.:  _____ |
| If to SHS: | c/o B. Judson Honaker, Jr.<br>1201 Central Park Boulevard<br>Fredericksburg, VA  22401<br>Telephone No.:  (540) 786-1447<br>Telecopy No.:  (540) 786-1406 |

If to Moncure:            Moncure Brothers, LLC
(of Affiliates)            c/o George V. Moncure, V, Manager
                 1200 Williams Street
                 Stafford, VA  22554
                 Telephone No.:  _____
                 Telecopy No.:  _____

If to SHS:               c/o B. Judson Honaker, Jr.
                 1201 Central Park Boulevard
                 Fredericksburg, VA  22401
                 Telephone No.:  (540) 786-1447
                 Telecopy No.:  (540) 786-1406

                 With a copy to:
                 c/o Samer E. Shalaby
                 159 Lichfield Boulevard, Suite 101
                 Fredericksburg, VA  22407
                 Telephone No.:  (540) 368-1327
                 Telecopy No.:  (540) 368-9001

                 With a copy to:
                 c/o Larry D. Silver
                 1001 East Telecom Drive
                 Boca Raton, FL  33431
                 Telephone No.: (561) 981-5252
                 Telecopy No.: (561) 981-5253

If to Dynasty:            c/o Larry D. Silver
                 1001 East Telecom Drive
                 Boca Raton, FL  33431
                 Telephone No.: (561) 981-5252
                 Telecopy No.: (561) 981-5253

14.15  Incorporation by Reference.  Every exhibit, schedule and other appendix attached to this Operating Agreement and referred to herein is incorporated in this Operating Agreement by reference unless this Operating Agreement expressly provides otherwise. Any exhibit or schedule not available at the time this Operating Agreement is executed shall be agreed upon, initialed and attached by the parties as soon after execution as it is practicable, but failure to attach any exhibit or schedule shall not affect the validity of this Operating Agreement unless the parties are in material disagreement as to the contents of such exhibit or schedule.

14.16  Not for Benefit of Creditors.  The provisions of this Operating Agreement are intended only for the regulation of the relations among the parties and the Company, and this Operating Agreement shall be enforceable only by those persons upon whom it is binding and to whom it inures.  This Operating Agreement is not intended for the benefit of any third-party

18

357389-3-4873 166

Exhibit B

creditors or assignees of the parties and does not grant any rights to or confer any benefits on any creditor or other party who is not a party.

14.17  <u>Notification and Cure Period</u>.  In no event shall a party be deemed in default hereunder unless such Member has received Notification of such default from the Company or from another party and has failed to cure such default within ten (10) Business Days after receiving such Notification (or, in the event of any non-monetary defaults which cannot be cured within such ten (10)-Business Day period, has failed to begin the cure within such ten (10)-Business Day period and to pursue diligently the cure to completion).  In the event other provisions of this Operating Agreement provide for a different notice and cure period, the notice and cure period provided in such other provisions and the notice and cure period provided in this Section shall run concurrently.

[Signatures contained on following page]

357389 3 4873 166

Exhibit B

IN WITNESS WHEREOF, the Manager and the Members of the Company have evidenced the adoption of this Operating Agreement by their signatures below, such adoption to be effective as of the date first written above.

MONCURE BROTHERS, LLC
a Virginia limited liability company

By: _____ (SEAL)
George V. Moncure, V, Manager

SHS QUANTICO, LLC
a Virginia limited liability company

By: _____ (SEAL)
B. Judson Honaker, Jr., President

DYNASTY INVESTORS, LLC
a Delaware limited liability company

By:  Silver Capital Advisors, Inc.,
     a Delaware corporation,
     its manager


By: _____ (SEAL)
Larry D. Silver, President/CEO

20

357389.3 4873 166

Exhibit B

IN WITNESS WHEREOF, the Manager and the Members of the Company have evidenced the adoption of this Operating Agreement by their signatures below, such adoption to be effective as of the date first written above.

MONCURE BROTHERS, LLC
a Virginia limited liability company

By:_____(SEAL)
    George V. Moncure, V, Manager

SHS QUANTICO, LLC
a Virginia limited liability company

By:_____(SEAL)
    B. Judson Honaker, Jr., President

DYNASTY INVESTORS, LLC
a Delaware limited liability company

By:  Silver Capital Advisors, Inc.,
     a Delaware corporation,
     its manager

     By:_____(SEAL)
         Larry D. Silver, President/CEO

20

Exhibit B

### Schedule A

Members, Capital Contributions, Percentage Interests

| Name of Member | Capital Contribution | Percentage Interest |
|---|---|---|
| Moncure Brothers, LLC | $1.00 | 49.995% |
| SHS Quantico, LLC | $1.00 | 49.995% |
| Dynasty Investors, LLC | $250,000.00 | 0.01% |

357389.3/4873.166

Exhibit B

Schedule B

Description of Land

Real property containing 84.436 acres, more or less, in Aquia Magisterial District (formally, Griffis-Widewater Magisterial District) of Stafford County, Virginia and commonly referred to as Fritter Park.

a.k.a TM #13-67, as more fully described in a Deed of Exchange dated August 31, 2004 and recorded as Instrument No. LR040033475 in the Clerk's Office of the Circuit Court of Stafford County, Virginia, by and between The Board of Supervisors of Stafford County, Virginia, as Grantor and George V. Moncure V, John Eric Moncure and James Ashby Moncure, as Grantees.

Excluding any of the foregoing real property sold or otherwise disposed of by QBC prior to the date of the Merger.

357389.3/4873.166